[No. B172533. Second Dist., Div. Three. Apr. 25, 2006.]

CORNELL STERLING MAYES et al., Plaintiffs and Appellants, v.
DAVID C. BRYAN et al., Defendants and Appellants.

COUNSEL

Law Offices of Bruce G. Fagel and Associates, Bruce G. Fagel, Richard Akemon and James E. Wright for Plaintiffs and Appellants.

Thelen Reid & Priest, Curtis A. Cole, Kenneth R. Pedroza, E. Todd Chayet; Schmid & Voiles, Susan Schmid and Rebecca J. Hogue for Defendants and Appellants.

OPINION

**ALDRICH, J.—**

## INTRODUCTION

Tracy Mayes, wife and mother respectively of plaintiffs Cornell Sterling Mayes, Alan James Mayes, and Christopher Scott Mayes, died at Huntington Memorial Hospital where she had undergone surgery to staple her stomach. Plaintiffs brought this wrongful death action against several physicians and nurses and their institutions who had been involved in Mrs. Mayes's treatment, including David C. Bryan, M.D., and Hill Medical Corporation.[1]

---

[1] Plaintiffs also sued surgeon David Joseph Lourie, M.D., Comprehensive Surgical Specialists, pulmonary and critical care physician John Carmody, M.D., Foothill Pulmonary Critical Consultants Medical Group, surgical resident Daniel Scott Diamond, M.D., and Huntington Memorial Hospital. By the time the jury commenced deliberations, all of the defendants except Dr. Bryan and Hill Medical Corporation had settled with plaintiffs.

(Dr. Bryan and his corporation are hereinafter referred to as defendants.) Plaintiffs' theory at trial was that Dr. Bryan's negligent postoperative interpretation of a lung scan led the other physicians involved to treat Mrs. Mayes for a pulmonary embolism even though she was suffering from a bowel obstruction, and to delay reoperation that could have prevented her death. The jury found that Dr. Bryan was negligent and his negligence was a cause of Mrs. Mayes's death. Judgment was entered against Dr. Bryan in the amount of $867,107, plus costs of $37,146.22.

Defendants appeal asserting instructional error. We hold that defendants invited any error in the substantial factor instruction and cannot be heard to complain on appeal. We further hold that the trial court did not err in omitting to instruct the jury on "but for" causation because that instruction would have been redundant, with the result that the omission did not prejudice defendants. Accordingly, we affirm the judgment of liability.

Plaintiffs' cross-appeal challenging the method by which the court calculated the damages Dr. Bryan owes. We affirm the damage calculation. Accordingly, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The testimony.*

Thirty-nine-year-old Mrs. Mayes was morbidly obese. She underwent elective laparoscopic gastric bypass surgery (stomach stapling) at Huntington Memorial Hospital on the afternoon of December 11, 2000. Mrs. Mayes was recovering normally the next morning and so she was cleared to be discharged.

Around 12:00 noon on December 12, 2000, Mrs. Mayes began to experience pain, nausea, and vomiting, which were not controlled by medication. She was given Tylenol with codeine. Her condition deteriorated throughout the day, the postoperative nurses noted at 7:00 p.m.

Dr. Lourie, Mrs. Mayes's surgeon, visited the patient on the evening of December 12th. She was crying from pain. He concluded that she was feeling

routine postoperative pain. Around 9:00 p.m., he ordered medication for pain and nausea and postponed her discharge from the hospital. He made no notes and ordered no tests or studies. Despite being medicated, Mrs. Mayes was still suffering fairly severe pain at 11:00 p.m.

Around 12:00 midnight on December 12th, Mrs. Mayes experienced an increase in blood pressure, and upon returning from the bathroom, she complained of difficulty in breathing and chest pain, became pale and weak, and her heart rate increased beyond normal limits. The nurse paged Dr. Higley, a first-year surgical resident. Dr. Higley called Dr. Diamond, a second-year resident, and told him it looked like Mrs. Mayes had a pulmonary embolism. A pulmonary embolism is a small blood clot that travels along a vein into the lungs and blocks off the blood supply to the lungs. It is a common cause of postoperative death in gastric bypass patients. Dr. Diamond's first concern was pulmonary embolism.

At about 1:00 a.m., on December 13th, Dr. Diamond evaluated Mrs. Mayes and found her "dramatically compromised." The speed with which Mrs. Mayes's event occurred, combined with her shortness of breath, fast heart rate, blood pressure, and respiration rate raised concerns that she had a pulmonary embolism or had suffered a "cardiac event." To confirm or rule out pulmonary embolism and other possibilities, the doctors needed more definitive tests. Among the tests they ordered were a chest x-ray, EKG, blood analyses, and a ventilation perfusion lung scan (V-Q scan or lung scan).[2] The lung scan took "[a] little over an hour."

The lab tests showed an elevated white blood cell count, which might occur after surgery or because of pulmonary embolus, infection, or stress. The tests also indicated that bleeding was a consideration, but that likelihood fell very low on Dr. Diamond's list of possibilities based on the patient's presentation.

In terms of a differential diagnosis, i.e., all the possible things that could explain Mrs. Mayes's symptoms, physical findings, and laboratory results, Dr. Higley listed: pulmonary embolism, bleeding, bowel obstruction, gastric leak, and myocardial infarction, among other things.

---

[2] A V-Q scan or ventilation perfusion scan produces an image of the chest that can aid doctors in evaluating the possibility of a pulmonary embolism.

Mrs. Mayes's pain was also symptomatic of deep vein thrombosis, another risk associated with abdominal surgery. Mrs. Mayes did not display abdominal pain associated with a bowel obstruction, but she showed other signs of obstruction or leak, such as tenderness, vomiting, increased heart rate, and fever.

Pulmonary embolism remained at the top of Dr. Diamond's differential diagnosis list. Of the 23 observations, tests, and findings considered, all were consistent with a pulmonary embolism. Dr. Diamond felt Mrs. Mayes's situation was life threatening. At 1:45 a.m., Dr. Lourie thought she had pulmonary embolism. This was the working diagnosis before the results from the V-Q scan were received.

The lung scan was completed about 2:00 a.m. and the images were transmitted electronically to the home of Dr. Bryan, the on-call radiologist. Dr. Bryan kept no notes about, and has no memory of, his evaluation of the lung scan film. Dr. Higley testified that she spoke to Dr. Bryan on the telephone about 2:00 a.m. *Dr. Bryan told her that the lung scan showed a "high probability" of pulmonary embolism.* Dr. Higley had Dr. Bryan repeat the results for Dr. Diamond, who was standing next to her. *Dr. Higley asked, "does that mean the patient is having a P. E.?" Dr. Bryan responded, "Yes."* (Italics added.)

Dr. Diamond testified, once he was told by Dr. Bryan that the lung scan showed a pulmonary embolism, *he no longer considered that Mrs. Mayes was suffering abdominal bleeding,* despite blood test results that were consistent with postoperative bleeding.

Dr. Diamond called Dr. Lourie to report that "Dr. Bryan says this is a P.E." Told of the test results, including the lung scan interpretation, Dr. Lourie agreed with Dr. Diamond's assessment. The lung scan result, Dr. Lourie felt, was "further confirmation" of overwhelming clinical evidence that Mrs. Mayes had a pulmonary embolism. After receiving Dr. Bryan's analysis, Dr. Lourie decided that pulmonary critical care specialist Dr. Carmody needed to be called to assist in the evaluation of Mrs. Mayes's condition.

Mrs. Mayes was admitted to the intensive care unit and given two units of blood. Around 2:00 a.m., the doctors considered giving Mrs. Mayes antibiotics. But infection was not high on their list of possible conditions because Mrs. Mayes did not have a temperature.

Told of the lab test results, including Dr. Bryan's reading of the lung scan, at 3:45 a.m., Dr. Carmody diagnosed Mrs. Mayes with a pulmonary embolism. He explained that the "whole . . . clinical picture," along with the data, indicated "far [and] away" that Mrs. Mayes had a pulmonary embolism. In particular, *the lung scan convinced him that Mrs. Mayes needed emergency treatment for pulmonary embolism.* Dr. Carmody explained that the "high probability" result for the lung scan "made a very difficult decision easier." Without that information, Dr. Carmody would have discussed the clinical picture with the treating surgeons.

Dr. Carmody treated Mrs. Mayes for pulmonary embolism. She received TPA, a "clot buster" and Heparin to prevent further clots, despite the significant risk of bleeding associated with these medications, and despite obvious indications and the doctors' suspicion that Mrs. Mayes might have active abdominal bleeding or be in septic shock. Dr. Carmody explained that he weighed the risks associated with giving Mrs. Mayes the extreme measure of TPA, even though she was also showing signs of bleeding. Dr. Carmody explained, once Mrs. Mayes had the TPA, her risk of bleeding increased and she would have to be watched. Dr. Lourie concurred with Dr. Carmody's treatment. When she was given the TPA and Heparin, several parameters indicated Mrs. Mayes was improving.

Nonetheless, Mrs. Mayes's condition deteriorated further. Around 8:00 a.m., her white blood cell count was four times that preoperatively, and her temperature jumped to over 102.8 degrees, both indicative of infection and septic shock. These symptoms could have also been present with a pulmonary embolism.

At 9:00 a.m., Dr. Andy Wang, a nuclear radiologist along with Dr. Bryan at Hill Medical Corporation, re-reviewed the lung scan along with the chest x-ray, and concluded there was a *"low probability"* of pulmonary embolism. Dr. Wang did not notify anyone of his finding because a "low probability" scan did not require action and he was not aware of Dr. Bryan's earlier interpretation of "high probability."

Mrs. Mayes was in septic shock by 11:30 a.m.

In the early afternoon, a Swan-Ganz catheter, a device that allows for more direct measurement of activity inside the patient's right atrium, was inserted in Mrs. Mayes's heart. The results showed early signs of sepsis, as had Mrs. Mayes's elevated white blood cell count and early morning fever.

Dr. Carmody learned that the lung scan showed a "low probability" for pulmonary embolism at about *2:20 in the afternoon.* Around this time, he also received test results that indicated changes and complications in Mrs. Mayes's abdominal area. Within minutes of learning of the scan's reinterpretation, Dr. Carmody gave the order to cease giving Heparin to Mrs. Mayes and indicated in the patient's notes *"expect septic picture."* (Italics added.) Antibiotics were first administered to Mrs. Mayes at 2:30 p.m., 12 hours after the first sign of infection appeared, and three hours after she had fallen into septic shock.

All along, Mrs. Mayes's condition had been deteriorating as the gastric contents of her stomach leaked into the abdominal cavity. Unless she was taken to surgery to correct it and remove the fluid that had leaked from the stapling line of the stomach, she would continue to deteriorate. She was taken for an operation about 5:00 p.m. The operative findings revealed that she had suffered bleeding and gastric leak after her first operation, causing infection. In the ensuing two months, Mrs. Mayes had 43 exploratory procedures, 11 of which were operations.

Mrs. Mayes died on February 13, 2001, after cardiac arrest and "multi-system organ failure" brought on by a bowel obstruction that caused the contents of her stomach to leak into and contaminate her abdominal cavity.

### 2. *Plaintiffs' experts.*

Plaintiffs' theory of the case was that Dr. Bryan negligently interpreted and reported the lung scan as showing a "high probability" for pulmonary embolism. Dr. Bryan's incorrect diagnosis led the treating physicians to waste a 12-hour window of opportunity—from the evening of December 12, when

there was evidence of bowel obstruction, through the morning of December 13—during which time, Mrs. Mayes's condition could have been properly identified and her death averted.

Plaintiffs' expert, Surgeon Edward H. Phillips, testified that the death was preventable by the recognition and treatment of the bowel obstruction or early intervention after the gastric leak became obvious in the morning, by washing out the abdomen. Dr. Phillips testified that Mrs. Mayes's condition required an operation before the patient went into shock. Once a patient went into shock, the likelihood of death increased rapidly.

In Dr. Phillips's opinion, there was an 11- or 12-hour window of opportunity to intervene and treat Mrs. Mayes, starting in the evening of December 12th, when there was evidence of bowel obstruction and gastric leak through the morning of December 13th when Mrs. Mayes went into septic shock. Dr. Bryan read the lung scan in the middle of that 12-hour period. Had Mrs. Mayes been properly diagnosed and treated during that window, Dr. Phillips opined that, to a reasonable degree of medical probability, she would be alive today.

Dr. Phillips explained that Dr. Lourie breached the standard of care in failing to timely order gastrointestinal tests by 9:00 p.m. on December 12th, about five hours before Dr. Bryan interpreted the lung scan, because bowel obstruction is the most common, serious complication of a gastric bypass surgery. According to Dr. Phillips, Dr. Lourie's failure to order an upper gastrointestinal x-ray on the night of December 12th, and to diagnose a bowel obstruction was a significant factor in causing her death.

Asked to assume that Dr. Bryan told Dr. Lourie that the V-Q scan showed a "low probability" of pulmonary embolism when the scan was first read in the middle of the night, Dr. Phillips responded that *"at that point it was reasonable and prudent to assume she had a leak"* and do an upper gastrointestinal exam or operate. (Italics added.)

Dr. John Morse Luce, a pulmonary and critical care physician, testified for plaintiffs that he did not "believe that Tracy Mayes had a pulmonary embolism" "because the symptoms and signs that she showed in the early morning hours of December 13th were compatible with other diagnoses that I think were as likely as pulmonary embolism." Dr. Luce testified he believed the pulmonary embolism diagnosis was false or wrong. Once that diagnosis

had been made however, Dr. Luce testified, the doctors "were reluctant subconsciously to . . . give up that diagnosis and entertain possibly other diagnos[es] that might better fit the situation. [¶] . . . because of that the fact the patient was actually septic, that is to say had an infection[,] was overlooked in reading of the ventilation perfusion scan . . . ." According to Dr. Luce, the "entire chain of events leads to the patient not going to surgery until later than she should have otherwise." Dr. Luce testified that the possibility of pulmonary embolism was "probably intermediate."

Dr. Fredrick A. Birnberg, plaintiffs' expert radiologist, opined that Mrs. Mayes's V-Q scan showed "a low probability" of a pulmonary embolism. But, he also explained why it is important to take a chest x-ray into account when looking at a V-Q lung scan, especially for on-call doctors. Many anatomic defects show up on an x-ray that can help in the interpretation of a V-Q scan.

3. *Defendants' case.*

Defendants took the position that regardless of Dr. Bryan's interpretation, the doctors would have treated Mrs. Mayes for pulmonary embolism, and that the standard of care required Dr. Lourie to evaluate the gastric leak. Dr. Bryan testified as a percipient witness that Mrs. Mayes's lung scan did not show a "high probability," and there was no way he would have read that scan as showing a "high probability" score. He was sure that he called it an "intermediate probability," not a "high probability" of a pulmonary embolism.

Defense expert, Dr. David Winsor, opined that regardless of whether the V-Q scan was called in as a "low," "intermediate," or "high probability," "there is a significant probability that this patient ha[d] a pulmonary embolism."

Defendants also relied on Dr. Birnberg's testimony on cross-examination that if there were a high clinical probability of a pulmonary embolism, and the lung scan probability were "high," then the statistical probability of the patient having the disorder was extremely high. If the clinical probability were high and the V-Q scan probability were "high" or "intermediate," there was still a "substantial chance that the patient could have a pulmonary embolism." That is, if all the clinical data showed a high likelihood of pulmonary embolism and the V-Q scan revealed an intermediate probability, there was a 66 percent chance of a pulmonary embolism.

### 4. *The verdict.*

The jury returned a verdict finding defendants negligent in the care and treatment of Mrs. Mayes, and that the negligence was a cause of Mrs. Mayes's death. The jury found defendants 20 percent responsible and the settling doctors 80 percent responsible for the total damages. The jury assessed a total of $3 million in noneconomic damages, and $1,366,357 in economic damages for a total award of $4,366,357.

After reducing the damages to reflect the allocation of fault, prior settlements, and the cap pursuant to Civil Code section 3333.2 (the Medical Injury Compensation Reform Act or MICRA) in a manner described more fully *post,* the court entered judgment against Dr. Bryan in the amount of $867,107, plus statutory costs as prevailing party. The court denied plaintiffs' Code of Civil Procedure section 998 prejudgment interest because their offer of $1 million was more than the amount of the total judgment against the nonsettling party. Defendants and plaintiffs filed their timely appeal and cross-appeal, respectively.

## DISCUSSION

### I. *Defendants' appeal.*

#### a. *Standard of review.*

When the sole contention on appeal concerns a jury instruction, we do not view the evidence in a light most favorable to the prevailing party. Rather, to assess the instruction's prejudicial impact, we assume the jury might have believed appellant's evidence and, if properly instructed, might have decided in appellant's favor. (*Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1152, fn. 2 [84 Cal.Rptr.2d 257].) "Accordingly, we state the facts most favorably to the party appealing the instructional error alleged, in accordance with the customary rule of appellate review. [Citation.]" (*Ibid.*; see also *Viner v. Sweet* (2004) 117 Cal.App.4th 1218, 1224–1225 [12 Cal.Rptr.3d 533].)

Still, "[i]n a civil case an instructional error is prejudicial reversible error only if it is *reasonably probable* the appellant would have received a more

favorable result in the absence of the error. [Citations.]" (*Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233, 1248–1249 [132 Cal.Rptr.2d 765], italics added, citing Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.) "As the *Soule* court put it, the determination of prejudice depends heavily on 'the particular nature of the error, including its natural and probable effect on a party's ability to place his full case before the jury. [¶] . . . Actual prejudice must be assessed in the context of the individual trial record.' " (*Logacz v. Limansky, supra,* 71 Cal.App.4th at p. 1156, quoting *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 580–581 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

Hence, when evaluating the evidence to assess the likelihood that the trial court's instructional error prejudicially affected the verdict, we "must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule v. General Motors Corp., supra,* 8 Cal.4th at pp. 580–581, fn. omitted.)

### b. *The "substantial factor" instruction.*

Defendants contend the trial court instructed the jury from an erroneous version of "substantial factor." We conclude that defendants may not raise this issue on appeal, as they invited the error.

### 1. *Facts.*

According to the court clerk, *both parties* requested and the court gave the following version of the "substantial factor" test from BAJI No. 3.76, with the agreed-upon modifications in italics: "The law defines cause in its own particular way. The cause of an injury or *death* is something *more likely than not a factor in bringing about* the injury *or death.*"[3] (Cf. *Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 132 [39 Cal.Rptr.2d 658].)

Because draft versions of the Judicial Council of California Civil Jury Instructions (CACI) were issued during this case, *both parties* requested and

---

[3] In 2003, BAJI No. 3.76 read: "The law defines cause in its own particular way. A cause of [injury], [damage], [loss] [or] [harm] is something that is a substantial factor in bringing about an [injury], [damage], [loss] [or] [harm]."

the court instructed from the following version of CACI No. 431 on multiple causes, with the agreed-upon modifications in italics: "A person's negligence may combine with another factor to cause *death*. If you find that Dr. Bryan's negligence was *a cause* of Tracy Mayes's *death*, then Dr. Bryan is responsible for the *death*. Dr. Bryan cannot avoid responsibility just because some other person, condition, or event was also *a cause* of Tracy Mayes's death."[4]

There is no transcript of the proceedings during which the jury instructions were discussed, selected, and modified. We have been provided only with the reporter's transcript from the argument concerning defendants' motion for mistrial. It shows that the following occurred: After the jury had been deliberating for six hours, counsel for defendants notified the court that she believed that CACI No. 431, as given, was improperly worded. Defendants moved either for mistrial or for an additional instruction about "substantial factor." Defendants claimed that plaintiffs' attorney surreptitiously altered the language of CACI No. 431 by excluding the word "substantial" from the instruction. Defense counsel noted that she had objected during plaintiffs' closing argument but was overruled.[5]

The court responded by recounting its memory of the events. "We had gone over all the jury instructions. This is my recollection . . . . [¶] In going over instructions, we looked at [BAJI No.] 3.76. We all agreed for medical malpractice case it had to be tailored . . . . [¶] . . . I think there were alternatives posed to the court, one of which was CACI. I said that appears to be an appropriate instruction to give. So we tailored it. He [plaintiffs' counsel] didn't tailor it. [¶] [Plaintiffs' attorney] brought it in exactly the way we had talked about it *because I compared it . . . . We had talked about this particular instruction and* [plaintiffs' counsel] *brought it in exactly this way.* [¶] . . . It appeared to be [*sic*] order. It did not appear to be any different and we talked about it. I thereafter read to the jury. No objection whatsoever from defense. . . . There was no objection whatsoever." (Italics added.)

---

[4] In 2003, CACI No. 431 read: "A person's negligence may combine with another factor to cause harm. If you find that [*name of defendant*]'s negligence was a substantial factor in causing [*name of plaintiff*]'s harm, then [*name of defendant*] is responsible for the harm. [*Name of defendant*] cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing [*name of plaintiff*]'s harm."

[5] Defendants did object to a statement made by plaintiffs' attorney during closing argument. "[PLAINTIFFS' ATTORNEY]: [Defendants' attorney] when she was up here, put a document up and then read something different. If cause of injury or death is something more likely than not a factor. Sometimes prepositions are very important. They are there for a reason. 'A factor.' [¶] [DEFENDANTS' ATTORNEY]: I object. That is misstatement of the law. [¶] THE COURT: He [plaintiffs' attorney] is just reading it," i.e., reading the instruction as modified by the court and parties.

Plaintiffs' attorney remembered that the new phrase "more likely than not" in BAJI No. 3.76 was defendants' idea. Plaintiffs' counsel further explained that, once they modified BAJI No. 3.76 defining "substantial factor," then CACI No. 431, which normally includes the phrase "substantial factor" had to be modified. As plaintiffs' attorney stated: "[T]he way the court instructed or ordered that instruction 3.76 be modified required that CACI 431 correlate to it. You can't leave 'substantial factor' in 431 when you have . . . taken that definition out of 3.76. [¶] *[The defense] was apprised of all of that information, not just in writing, but also in discussions we had and then ultimately the copies that were brought in as was ordered by the court, to give [the defense] a copy. She* [defense counsel] *was going through them as I was doing my argument.* We obviously read 3.76 and CACI 431 because she [defense counsel] got up on argument and used them in argument." (Italics added.)

Defendants' attorney denied having proposed the change and argued that she was unaware until the mistrial motion that the instruction had been changed. The court responded that the instruction had been tailored exactly as the defense wanted it. The court repeated its recollection of the events: "We talked about a legal cause. *We all agreed. We went over the language. You agreed.* [¶] I read the instructions to the jury. *You agreed. You never once objected.* Now because the jury has been deliberating for some six hours, apparently you are getting nervous about the case. Now you bring this up and want to make an argument about this."[6] The court denied defendants' motion.

## 2. *Application.*

Defendants contend that the court erred in giving the version of BAJI No. 3.76 on "substantial factor" that it gave.

■ "It is an elementary principle of appellate law that '[a] party may not complain of the giving of instructions which he has requested. [Citation.]' [Citations.]" (*Fortman v. Hemco, Inc.* (1989) 211 Cal.App.3d 241, 255 [259 Cal.Rptr. 311].) "The invited error doctrine applies 'with particular force in the area of jury instructions. Whereas in criminal cases a court has strong sua sponte duties to instruct the jury on a wide variety of subjects, a court in a civil case has no parallel responsibilities. A civil litigant must propose complete instructions in accordance with his or her theory of the litigation and a trial court is not "obligated to seek out theories [a party] might have

---

[6] Defense counsel insisted she had proposed two instructions, to which the court replied that defense counsel's two proposed instructions were scribbled on. The court returned them to the clerk as appropriate.

advanced, or to articulate for him that which he has left unspoken." [Citations.]' [Citation.]" (*Stevens v. Owens-Corning Fiberglas Corp.* (1996) 49 Cal.App.4th 1645, 1653 [57 Cal.Rptr.2d 525].)

■ Defendants deny having requested the modifications. As appellants, defendants bear the burden of presenting a sufficient record to establish that the claimed error was *not* invited by them, or be barred from complaining about it on appeal. (*Phillips v. Noble* (1958) 50 Cal.2d 163, 169 [323 P.2d 385], italics added.) In the absence of a reporter's transcript of the discussions between the court and the parties, we rely on the transcript, above quoted, of the argument on defendants' motion for new trial. That record shows that defense counsel did deny requesting the change to the BAJI No. 3.76 "substantial factor" instruction that was given. The record also shows that the trial court found to the contrary, that the defense had *requested the modifications made.* We may not second-guess the trial court's finding, particularly so when the record is inadequate. Defendants cannot be heard to complain on appeal that the instruction was improperly worded.

■ In their reply brief, defendants argue they objected to the modified instructions before the jury reached a verdict. Although defendants posed an objection to their own instruction during plaintiffs' closing argument, the objection seemed to the trial court to be directed to plaintiffs' counsel's argument, not to the word choice in the instruction. It appears that defendants first complained that their own instruction was badly worded only after the jury had been deliberating for *six hours.* While appellate courts "have broad discretion to decide whether to consider a tardily raised legal issue[, w]e are more inclined to do so when matters of important public interest or public policy are involved. [Citation.] If the matter is important enough, we may consider it even though the appellant adopted an inconsistent position in the trial court. [Citation.]" (*Stevens v. Owens-Corning Fiberglas Corp., supra,* 49 Cal.App.4th at p. 1654.) This case presents no urgent public interest or policy justifying reaching the issue, especially because any error was invited.

More important, the instructions as given did not prejudice defendants. First, the BAJI No. 3.76 instruction adequately provided an alternative meaning of "substantial" factor, i.e., "more likely than not" a factor. (*Osborn v. Irwin Memorial Blood Bank* (1992) 5 Cal.App.4th 234, 253 [7 Cal.Rptr.2d 101], quoting from Rest.2d Torts, § 433B, com. b., p. 443 [plaintiff need only show " 'it is more probable that the event was caused by the defendant than that it was not' "].) Second, the instruction did not fail to inform the jury that a substantial factor must be more than "remote or trivial," as *more likely than not* is inherently more than remote or trivial. (Cf. *Osborn, supra,* 5

Cal.App.4th 234.) Finally, CACI No. 431 as given was not misleading because it used the word "cause"—"if you find that Dr. Bryan's negligence was *a cause of* Tracy Mayes's death"—and "cause" was adequately defined for the jury in the modified BAJI No. 3.76.

 c. *The "but for" instruction.*

Defendants contend that the trial court erred in refusing to instruct the jury on "but for" causation. We conclude there was no error, but even if there were, defendants were not prejudiced.

 &#9646; " 'Parties have the "right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court." [Citation.] "A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented. [Citation.]" [Citation.]' [Citation.]" (*Logacz v. Limansky, supra,* 71 Cal.App.4th at p. 1157.)

Defendants requested that the trial court instruct the jury as follows: "Plaintiff must show that one or more of the defendants was a cause of plaintiff's injuries. To be a cause of injury, plaintiff must show that but for the alleged malpractice, it is more likely than not the plaintiff would have obtained a more favorable result. [¶] Based on *Viner v. Sweet.*"[7] The court rejected defendants' proposed instruction. There is no indication that defendants withdrew their request for, or invited any error with respect to, the "but for" instruction.

According to defendants' theory of the case, Dr. Bryan was not a cause of death because, they argue, the physicians would have treated Mrs. Mayes for pulmonary embolism anyway. That is, defendants argue, Mrs. Mayes would not have obtained a better result even if Dr. Bryan had not breached the standard of care.

 1. *The law of causation.*

 &#9646; The proper test for proving causation is the "substantial factor" test. (*Espinosa v. Little Co. of Mary Hospital* (1995) 31 Cal.App.4th 1304, 1313

---

[7] Defendants also submitted the following alternative instruction: "Plaintiff must show that one or more of the defendants was a cause of plaintiff's injuries. This requires the plaintiff to prove through expert testimony that *but for* the defendant(s) [*sic*] negligence, it is more likely than not the plaintiff would not have sustained her claimed injuries."

[37 Cal.Rptr.2d 541].) The "causation element of negligence is satisfied when the plaintiff establishes (1) that the defendant's breach of duty . . . was a substantial factor in bringing about the plaintiff's harm and (2) that there is no rule of law relieving the defendant of liability." (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 481 [50 Cal.Rptr.2d 785]; accord, *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1235 [32 Cal.Rptr.2d 136].)

■ "Conduct can be considered a substantial factor in bringing about harm if it 'has created a force or series of forces which are in continuous and active operation up to the time of the harm' [citation], or stated another way, 'the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another' [citation]." (*Osborn v. Irwin Memorial Blood Bank, supra,* 5 Cal.App.4th at p. 253.)

■ Causation is proven when "a plaintiff produces sufficient evidence 'to allow the jury to infer that in the absence of the defendant's negligence, there was a reasonable medical probability the plaintiff would have obtained a better result. [Citations.]' [Citation.]" (*Espinosa v. Little Co. of Mary Hospital, supra,* 31 Cal.App.4th at pp. 1314–1315, italics omitted, quoting from *Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 216 [6 Cal.Rptr.2d 900].)

In *Mitchell v. Gonzales* (1991) 54 Cal.3d 1041 [1 Cal.Rptr.2d 913, 819 P.2d 872] (*Mitchell*), the parents of a boy who died while with neighbors, sued the neighbors alleging negligence and wrongful death. (*Id.* at pp. 1045–1047.) With respect to causation, the majority in *Mitchell* disapproved as misleading BAJI No. 3.75, which contained a "but for" test of causation (54 Cal.3d at pp. 1048–1049), and held that BAJI No. 3.76, which employs the "substantial factor" test of cause in fact (54 Cal.3d at p. 1049), should be given in its stead.

*Mitchell* reasoned that "BAJI Nos. 3.75 and 3.76 are *alternative* instructions that *should not jointly be given in a single lawsuit.* [Citation.]" (*Mitchell, supra,* 54 Cal.3d at p. 1049, first italics in original, second italics added.) After concluding that BAJI No. 3.75 was grammatically confusing and conceptually misleading (54 Cal.3d at pp. 1050–1052, 1054), and after noting the praise BAJI No. 3.76 received (54 Cal.3d at p. 1052), the Supreme Court held that use of the latter instruction would avoid the confusion inherent in BAJI No. 3.75. (54 Cal.3d at p. 1054.) *Mitchell* reasoned that "*the 'substantial factor' test subsumes the 'but for' test.* 'If the conduct which is claimed to have caused the injury had nothing at all to do with the injuries, it could not be said that the conduct was a factor, let alone a substantial factor, in the production of the injuries.' [Citation.]" (*Id.* at p. 1052, italics added.) The court explained that while the substantial factor instruction assists in the

resolution of the problem of independent causes, it is also useful in resolving two other types of cases: (1) " 'where a similar, but not identical result would have followed without the defendants' act;' " and (2) " 'where one defendant has made a clearly proved but quite insignificant contribution to the result, as where he throws a lighted match into a forest fire. *But in the great majority of cases, it produces the same legal conclusion as the but-for test.*' " (*Id.* at pp. 1052–1053, italics added.) " '[N]o case has been found where the defendant's act could be called a substantial factor when the event would have occurred without it; nor will cases very often arise where it would not be such a factor when it was so indispensable a cause that without it the result would not have followed.' [Citation.]" (*Id.* at p. 1053.)[8] Hence, BAJI No. 3.76 was an adequate instruction in *Mitchell* as a substitute for the discarded instruction containing the "but for" test.

More recently, in *Viner v. Sweet* (2003) 30 Cal.4th 1232 [135 Cal.Rptr.2d 629, 70 P.3d 1046] (*Viner*), the Supreme Court held that "[w]hen the alleged malpractice occurred in the performance of transactional [legal] work . . . the client [must] prove this causation element according to the 'but for' test, meaning that the harm or loss would not have occurred without the attorney's malpractice[.]" (*Id.* at p. 1235.) *Viner* rejected the appellate court's holding that a plaintiff suing an attorney for transactional malpractice need not show that the harm would not have occurred in the absence of the attorney's negligence. (*Id.* at p. 1240.) "In a litigation malpractice action, the plaintiff must establish that *but for* the alleged negligence of the defendant attorney, the plaintiff would have obtained a more favorable judgment or settlement in the action in which the malpractice allegedly occurred. The purpose of this requirement, which has been in use for more than 120 years, is to safeguard against speculative and conjectural claims. [Citation.] It serves the essential purpose of ensuring that damages awarded for the attorney's malpractice actually have been caused by the malpractice. [Citation.]" (*Id.* at p. 1241.) *Viner* saw "nothing distinctive about transactional malpractice that would justify a relaxation of, or departure from, the well-established require-ment in negligence cases that the plaintiff establish causation by showing either (1) *but for* the negligence, the harm would not have occurred, or (2) the negligence was a concurrent independent cause of the harm." (*Id.* at pp. 1240–1241, original italics.)[9]

---

[8] *Mitchell* also observed that the word "substantial" in BAJI No. 3.76 was susceptible of misuse. (*Mitchell, supra,* 54 Cal.3d at p. 1053.) *Mitchell* noted the concern of others that new uses for BAJI No. 3.76 have been created. An example was where a defendant's conduct, while clearly a "but for" cause of injury, did not substantially contribute to the harm. In such a case, the "substantial factor" test "undermines the principles of comparative negligence . . . ." (*Ibid.*) Here, however, we are not faced with this problem because the jury found that Dr. Bryan's negligence was a substantial factor in bringing about Mrs. Mayes's harm.

[9] This case does not involve concurrent independent causes, plaintiffs' suggestion to the contrary notwithstanding. Plaintiffs have not shown that each of the negligent acts individually

■ Defendants cite *Viner* for the proposition that even if plaintiffs demonstrated that defendants' conduct was a *substantial factor* in bringing about Mrs. Mayes's injury, that plaintiffs must also prove "but for" causation. Yet, *Viner,* a legal malpractice case, did not require that a jury be instructed on both the "but for" and "substantial factor" tests. *Viner* acknowledged that *Mitchell* did not repudiate the "substantial factor" test. (*Viner, supra,* 30 Cal.4th at pp. 1239–1240, citing *Mitchell, supra,* 54 Cal.3d at p. 1052.) Rather, the Supreme Court has repeatedly restated its view that "*the 'substantial factor' test subsumes the traditional 'but for' test* of causation." (*Viner,* at p. 1240.) They are both tests of causation in fact. (6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 1185, pp. 552–553.)

■ For this reason, Witkin teaches us, "The first element of legal cause is *cause in fact . . . .* The 'but for' rule has traditionally been applied to determine cause in fact. [Citations.] [¶] The Restatement formula uses the term *substantial factor* 'to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause.' [Citation.]" (6 Witkin, *supra,* Torts, § 1185, pp. 552–553, original italics.)

Indeed, the fact that the "but for" test is included in the "substantial factor" definition has been recognized by the Judicial Council in revising CACI No. 430, the new substantial factor instruction. The summer 2005 revision of this instruction reads: "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm. [¶] [Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct.]" (CACI No. 430 (rev. ed. Summer 2005), underscoring in original.) The directions for use of CACI No. 430 state clearly, "*As phrased, this definition of 'substantial factor' subsumes the 'but for' test of causation,* e.g., plaintiff must prove that but for defendant's conduct, the same harm would not have occurred. [Citation.] *The first sentence of the instruction accounts for the 'but for' concept.* Conduct does not 'contribute' to harm if the same harm would have occurred without such conduct." (*Ibid.,* italics added, citing *Viner, supra,* 30 Cal.4th at pp. 1239–1240; accord, CACI No. 430 (rev. ed. Dec. 2005).) There is no requirement in either recent revision of CACI No. 430 that the bracketed language be used *in addition to* the first sentence of the instruction. Rather, both versions of CACI No. 430 explained that the additional bracketed

caused Mrs. Mayes's death. Rather, plaintiffs' theory of the case was that the death was brought about by a combination of Dr. Bryan's negligent interpretation of the lung scan and the surgeon's failure to recognize a gastric leak. Hence, *Vecchione v. Carlin* (1980) 111 Cal.App.3d 351, 359 [168 Cal.Rptr. 571], does not apply. (*Viner, supra,* 30 Cal.4th at p. 1240.)

language *"may* be used . . . ."" (Italics added.)[10] Thus, the trial court is not *required* to instruct from both tests of cause in fact unless the state of the evidence suggests otherwise.

 2. *Application of the law to this case; the court did not err in declining to instruct on "but for" and defendants were not prejudiced by the ruling.*

Reviewing the evidence as we must (*Logacz v. Limansky, supra,* 71 Cal.App.4th at p. 1152, fn. 2), we conclude the trial court did not err in refusing to instruct the jury on "but for" causation because the jury was instructed on "substantial factor" and "but for" is subsumed under the substantial factor test. (*Mitchell, supra,* 54 Cal.3d at p. 1052; *Viner, supra,* 30 Cal.4th at pp. 1239–1240.) Hence, a "but for" instruction would have been redundant.

On this record there is no likelihood that, instructed on "but for," the jury could have found Dr. Bryan was *not* a cause in fact of Mrs. Mayes's death. Defendants contend that the clinicians would have treated Mrs. Mayes for pulmonary embolism anyway.[11] They cite Dr. Winsor's testimony that "there is a significant probability that this patient ha[d] a pulmonary embolism" and

---

[10] In arguing that the jury should have been instructed on both "substantial factor" *and* "but for," defendants focus on a footnote in *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108 [8 Cal.Rptr.3d 363], which cites *Viner. Jennings* concerned the admissibility of expert testimony in a medical malpractice case. That testimony was struck because, among other things, it was too speculative to satisfy the standard that it was *"more probable than not* [that] the negligent act was a cause-in-fact of the plaintiff's injury." (*Id.* at p. 1118.) In the *footnote* defendants cite, *Jennings* stated, the plaintiff "correctly notes that liability attaches if negligence is a substantial factor in causing the injury, and [the expert] testified the retained retractor *either caused or contributed to the infection.* However, on the facts of this case, this is a distinction without a difference. Proof that a negligent act was a substantial factor in causing the injury does not relieve the plaintiff of the burden of proving the negligent act was a cause-in-fact of the injury [citation], and therefore we must test the propriety of the trial court's order striking [the expert's] opinion by assuming he sought to opine the retained retractor was a cause-in-fact of the infection." (*Id.* at p. 1114, fn. 3, italics added, citing *Viner v. Sweet, supra,* 30 Cal.4th at pp. 1239–1244.) That is, the expert's testimony in *Jennings* did not demonstrate cause-in-fact, no matter how causation was phrased. (*Jennings, supra,* 114 Cal.App.4th at pp. 1118–1121.) *Jennings* does not stand for the proposition that when admissible evidence of causation in fact has been adduced, the jury must be instructed on both "substantial factor" *and* "but for" causation. *Jennings* does not undermine the conclusion that the court is not required to instruct from both tests of cause-in-fact unless the state of the evidence suggests otherwise.

[11] Defendants argue that Dr. Bryan's analysis was "a preliminary interpretation" that differed from "the formal interpretation made later that morning" by Dr. Wang. The evidence does not support this gloss in any measure. Rather, it shows that Dr. Bryan's analysis was the formal one as it was the analysis that persuaded the clinicians to treat Mrs. Mayes for pulmonary embolism and no longer to consider any of the other disorders on the differential diagnoses.

Dr. Birnberg's testimony as support for their assertion that there was a 66 percent chance of a pulmonary embolism.[12] Although Dr. Winsor found a significant probability that the patient had a pulmonary embolism, *there was no evidence that the clinicians would have treated Mrs. Mayes for that problem if Dr. Bryan had reported a "low" or even "intermediate" probability*, defendants' assertion to the contrary notwithstanding. To the contrary, the testimony from Drs. Carmody, Diamond, and Luce is that the clinicians considered gastric leak and bowel obstruction as possibilities, albeit low on the differential diagnosis list, until they received Dr. Bryan's scan interpretation because that interpretation *conclusively influenced* the decision to treat Mrs. Mayes for pulmonary embolism and to *cease* considering other diagnoses.

There is no evidentiary support for defendants' contention that Mrs. Mayes would have died even had Dr. Bryan not acted negligently. Apart from the many witnesses who testified that the "high probability" analysis persuaded them that Mrs. Mayes had a pulmonary embolism, and Dr. Luce's testimony that the treating physicians were misled by Dr. Bryan's interpretation, Dr. Carmody specifically testified that *without* Dr. Bryan's lung scan analysis of "high probability," he would have discussed the entire clinical picture with the treating doctors. Instead, he rushed in on an emergency basis to give her "clot busting" medication.

Defendants assert that "a low probability interpretation would *not* have yielded the decedent a better result." To the contrary, the evidence shows that immediately upon learning that Dr. Wang reinterpreted Mrs. Mayes's scan and found it to show a "low probability," Dr. Carmody ordered that the treatment for pulmonary embolism be stopped. Asked to assume that Dr. Bryan reported a "low probability" interpretation, Dr. Phillips testified, "at that point it was reasonable to assume she had a leak." The only logical conclusion that the jury could reach from this testimony was that had it not been for Dr. Bryan's negligent interpretation of the V-Q scan, the 12-hour window of opportunity would not have been squandered and Mrs. Mayes could have been properly treated in time.

---

[12] Defendants argue that "plaintiffs' experts admitted [that] an interpretation of the VQ scan as an intermediate probability for pulmonary embolism would have been within the standard of care." Dr. Birnberg did agree on cross-examination that if the *clinical* probability of pulmonary embolism is high and the *V-Q scan* probability is *high or intermediate*, there is a substantial or 66 percent chance of pulmonary embolism. However, defendants have given us no citation to the record where any *expert opined that a reading of "intermediate probability" for Mrs. Mayes's lung scan fell within the standard of care.* Nor do they cite testimony that *had the treating physicians received a reading of "intermediate probability"* from Dr. Bryan, that they would have treated Mrs. Mayes for pulmonary embolism anyway.

In short, the evidence does not support defendants' contention that the clinicians would have treated Mrs. Mayes for pulmonary embolism regardless of Dr. Bryan's negligence.

Moreover, even if, per *Viner*, courts in medical malpractice cases must now instruct juries on both "substantial factor" and "but for," we conclude on the whole record here that no prejudice resulted from the lack of "but for" instruction. (*Soule v. General Motors Corp., supra*, 8 Cal.4th at pp. 580–581.) Looking at the instructions on causation given (*id.* at p. 580), the jury was instructed on "substantial factor," and the concept of "but for" is necessarily included within. Not only would a "but for" instruction have been redundant according to *Mitchell, Viner*, and the revised versions of CACI No. 430 that defendants cite, but the jury impliedly found "but for" causation when it found that Dr. Bryan's negligent interpretation of the lung scan was a substantial factor in causing Mrs. Mayes's death. This is so because for the jury to find that Dr. Bryan was a substantial factor in Mrs. Mayes's mistreatment, it necessarily concluded that Mrs. Mayes's injury would not have happened without Dr. Bryan's negligence. There was no likelihood that the jury was misled. The verdict was not close; the jury found causation by a ratio of 11 to 1. It did not request a rereading of the instructions. Nor was anything said in the closing arguments that could be construed as reasonably misleading. Consequently, it is not reasonably probable defendants would have received a more favorable result even had the court instructed on "but for" causation. (*Soule v. General Motors Corp., supra*, 8 Cal.4th at pp. 580–581.) The trial court's refusal to instruct on "but for" did not prejudice defendants.

## II. *Plaintiffs' cross-appeal.*

Plaintiffs' sole assignment of error lies in the court's calculation of damages, specifically, the computation of noneconomic damages. They posited two approaches, either of which, together with costs of $37,146.22, would have permitted plaintiffs to obtain their Code of Civil Procedure section 998 prejudgment interest on their offer of $1 million in settlement.

The jury awarded plaintiffs $3 million in noneconomic damages, and $1,366,357 in economic damages, for a total verdict of $4,366,357. The jury determined that defendants' proportionate liability was 20 percent, and the settling parties' was 80 percent. Plaintiffs recovered a total of $650,000 from the settling defendants.[13]

---

[13] Plaintiffs settled with Dr. Diamond and Huntington Memorial Hospital for $200,000; with Dr. Carmody and Foothill Pulmonary and Critical Care Consultants Medical Group for $150,000; and Dr. Lourie and Comprehensive Surgical Specialists, Inc. for $300,000, for an aggregate of $650,000.

Following *Gilman v. Beverly California Corp.* (1991) 231 Cal.App.3d 121 [283 Cal.Rptr. 17], and *Espinoza v. Machonga* (1992) 9 Cal.App.4th 268 [11 Cal.Rptr.2d 498], the trial court computed the award by first reducing the noneconomic damage award from $3 million to $250,000 pursuant to MICRA, for a total damage award of $1,616,357 ($1,366,357 + $250,000). Based on this new number, the court then calculated the ratio of economic to total damages to be 84.5 percent ($1,366,357 = 84.5% x $1,616,357). The court then calculated that defendants were entitled to a benefit setoff of $549,250 from the economic portion of the proceeds of the settlement with the settling defendants (84.5% x $650,000 = $549,250). The court finally considered the jury's allocation to defendants of 20 percent liability pursuant to Proposition 51 for a total of $50,000 in noneconomic damages. The equation looked like this:

| | |
|---|---|
| $1,366,357 | Total economic damages awarded |
| - 549,250 | Economic portion of settlement subject to setoff |
| $817,107 | Defendants' share of remaining economic damages |
| + 50,000 | Defendants' 20 percent share of MICRA cap |
| $867,107 | Defendants' liability to plaintiffs |

Plaintiffs' contention is that it was unfair for the court to first reduce the noneconomic verdict of $3 million to the statutory MICRA maximum of $250,000 and then reduce it further under Proposition 51 to reflect the percentage of fault attributed to the settlement plaintiffs received.

The issue here is the interplay between MICRA (Civ. Code, § 3333.2), Proposition 51 (Civ. Code, § 1431.2), and settlements with other tortfeasors who are subject to MICRA. (Code Civ. Proc., § 877.)

 Civil Code section 3333.2, an essential part of MICRA, limits the size of any award of noneconomic damages in an action for injury against a health care provider based on professional negligence. (*Johnson v. Superior Court* (2002) 101 Cal.App.4th 869, 878 [124 Cal.Rptr.2d 650].)[14]

 Proposition 51 eliminated joint and several liability for noneconomic damages but retained it for economic damages. (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 600 [7 Cal.Rptr.2d 238, 828 P.2d 140].) Accordingly, Civil Code section 1431.2, subdivision (a) states, "In any action for personal injury . . . based upon principles of comparative fault, the liability of each defendant for noneconomic damages shall be several only and shall not be

---

[14] Section 3333.2, subdivisions (a) and (b) read, "In any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage. [¶] (b) In no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)."

joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."

Under section 877, "a good faith settlement cuts off the right of other defendants to seek contribution or comparative indemnity from the settling defendant [and] the nonsettling defendants obtain in return a reduction in their ultimate liability to the plaintiff." (*Abbott Ford, Inc. v. Superior Court* (1987) 43 Cal.3d 858, 873 [239 Cal.Rptr. 626, 741 P.2d 124].)[15]

In support of their contention that the court should have applied Proposition 51 before reducing noneconomic damages to the $250,000 MICRA cap, plaintiffs rely on *McAdory v. Rogers* (1989) 215 Cal.App.3d 1273 [264 Cal.Rptr. 71]. In a medical malpractice action, the *McAdory* jury found that the plaintiff had suffered noneconomic damages of $370,000 and was herself 22 percent comparatively negligent. The appellate court held that the trial court had erred in reducing the noneconomic damages to the MICRA limit first and then apportioning each party's fault. *McAdory* explained that MICRA was intended to cap the recovery of noneconomic damages rather than the damages the plaintiff actually suffers. The appellate court reasoned that as the result of MICRA, the plaintiff was "already recovering an amount less than the jury determined he or she was damaged by the tortious conduct of others . . . . No purpose would be served by further reducing that plaintiff's award." (215 Cal.App.3d at p. 1279.) The *McAdory* court saw "no legitimate or logical reason for reducing [the noneconomic damage] award to the $250,000 cap . . . *before* reducing it further due to Mrs. McAdory's 22 percent comparative fault." (*Id.* at p. 1281, original italics.)

*Atkins v. Strayhorn* (1990) 223 Cal.App.3d 1380 [273 Cal.Rptr. 231] followed *McAdory* in holding that the trial court had properly applied the jury's *comparative fault* finding before reducing the noneconomic damages under MICRA. (*Atkins, supra*, 223 Cal.App.3d at pp. 1392–1393.) *Atkins* also reasoned that the language of Civil Code section 3333.2 limited "the *recovery* rather than the value of noneconomic damages as a means of protecting the insurability of health care providers." (*Atkins, supra*, 223 Cal.App.3d at p. 1393.) *McAdory* and *Atkins* involved the interplay between MICRA and the plaintiffs' comparative negligence.

---

[15] Code of Civil Procedure section 877 reads in relevant part, "Where a release . . . is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort . . . it shall have the following effect: [¶] (a) It shall . . . reduce the claims against the others in the amount stipulated by the release . . . or in the amount of the consideration paid for it whichever is greater."

By contrast, *Gilman v. Beverly California Corp., supra*, 231 Cal.App.3d 121, relied on by the trial court here, construed the relationship between MICRA and Proposition 51. (231 Cal.App.3d at p. 128.) In *Gilman*, the children of a nursing home patient brought a wrongful death action based on medical malpractice against the operator of the nursing home. The decedent's physician was insolvent and not joined in the action but his fault was assessed. (*Gilman, supra,* at p. 126.) *Gilman* held that the trial court must apply the MICRA cap to the total noneconomic damage award before it determined the pro rata liability of each defendant. (231 Cal.App.3d at pp. 128–130.) The reason, according to *Gilman*, was that because the plaintiff could not recover more than $250,000 in noneconomic damages from all health care providers for one injury, the noneconomic damages should be apportioned based on the relative fault of each health care provider. (*Id.* at p. 129.)

*Gilman* distinguished *McAdory* and *Atkins*, explaining that neither case "dealt with the interplay between Proposition 51 and the MICRA cap. Rather, they dealt with the interrelationship between *comparative negligence principles* and MICRA." (*Gilman v. Beverly California Corp., supra,* 231 Cal.App.3d at p. 126, italics added.) By comparison, *Gilman* explained, "Proposition 51 . . . implicates very different considerations from those implicated in the *McAdory* and *Atkins* cases. Prior to the adoption of Proposition 51, multiple tortfeasors were ordinarily jointly and severally liable for *all* damages caused to an injured plaintiff where their acts contributed to the injury. This resulted in 'some situations in which defendants who bore only a small share of fault for an accident could be left with the obligation to pay all or a large share of plaintiff's damages if other more culpable tortfeasors were insolvent.' [Citation.]" (*Gilman v. Beverly California Corp., supra,* 231 Cal.App.3d at p. 127, original italics, quoting *Evangelatos v. Superior Court* (1998) 44 Cal.3d 1188, 1198 [246 Cal.Rptr. 629, 753 P.2d 585].) In *Gilman*, because more than one responsible defendant was subject to the MICRA, the court apportioned the MICRA limit among them. (*Gilman,* at pp. 128–129.)[16]

*Gilman* rejected the plaintiffs' argument that the court should first deduct from the jury's verdict the percentage of fault attributable to the other joint or concurrent tortfeasors and then reduce the amount to $250,000. "[I]t is clear that apportioning damages in this manner would effectively defeat the stated purposes of Proposition 51—to limit the potential liability of an individual

---

[16] *Francies v. Kapla* (2005) 127 Cal.App.4th 1381 [26 Cal.Rptr.3d 501], cited by plaintiffs is likewise inapposite. There, only one defendant was subject to the MICRA limit. (127 Cal.App.4th at p. 1389.) By contrast, as in *Gilman*, more than one defendant here shared responsibility for plaintiffs' injury and was subject to MICRA, necessitating, hence, the apportionment of the $250,000 MICRA limit.

defendant for noneconomic damages to a proportion commensurate with that defendant's personal share of fault." (*Gilman v. Beverly California Corp., supra,* 231 Cal.App.3d at p. 128.)

The *Gilman* plaintiffs also argued they should be compensated up to the MICRA limit even if some tortfeasors had not paid their share of the noneconomic damages. *Gilman* rejected that argument, stating: "If any of the concurrent tortfeasors is insolvent, the liability of the other tortfeasors remains unchanged." (*Gilman v. Beverly California Corp., supra,* 231 Cal.App.3d at p. 129, fn. 10.) Unlike cases involving the comparative liability of the plaintiff, when fashioning an award under both Proposition 51 and MICRA, the court should "not take into account whether *other tortfeasors* paid their proportional share. This is clearly the import of Proposition 51." (*Gilman,* at p. 130, italics added.) "The express purpose of Proposition 51 was to eliminate the perceived unfairness of imposing 'all the damage' on defendants who were 'found to share [only] a fraction of the fault.' [Citation.]" (*DaFonte v. Up-Right, Inc., supra,* 2 Cal.4th at p. 603.) Hence, under Civil Code section 1431.2, a " 'defendant['s]' liability for noneconomic damages cannot exceed his or her proportionate share of fault *as compared with all fault responsible for the plaintiff's injuries,* not merely that of 'defendant[s]' present in the lawsuit. [Citation.]" (*DaFonte, supra,* at p. 603.)

In this case, where more than one defendant shares responsibility for plaintiffs' injury, and plaintiffs were not at fault, the trial court properly followed the *Gilman* approach. As in *Gilman,* this case involves the interplay between MICRA and the percentages of fault of the various defendants under Proposition 51. *McAdory* and *Atkins* are irrelevant because neither case involved the allocation of fault to multiple defendants at issue here, and both cases involved an offset to damages for *the plaintiff's own comparative fault,* whereas comparative negligence principles are not implicated here.

Applying the reasoning of *Gilman,* each defendant is only responsible for the percentage of noneconomic damages in proportion to his or her proportionate fault. The $250,000 MICRA maximum for noneconomic damages must be apportioned according to Proposition 51. (*Gilman v. Beverly California Corp., supra,* 231 Cal.App.3d at pp. 127–128.) Defendants are not responsible for making up the amounts the settling parties did not pay. (*Id.* at p. 129.) Hence, the trial court here properly reduced the noneconomic verdict to the $250,000 MICRA cap before it applied the Proposition 51 percentage to the settlement.

Plaintiffs proposed that the proportion of economic damages to the total should be calculated *before* the MICRA cap is imposed. Hence, the proportion would be 31.31 percent ($1,366,367 total pre-MICRA divided by $4,366,357) times the settlement of $650,000 (31.31 x $650,000 = $203,450). Their math looks like this:

| | |
|---|---|
| $1,366,357 | Economic damages |
| - 203,450 | Economic portion of settlement subject to setoff. |
| + 50,000 | MICRA cap reduced by defendants' 20 percent fault |
| $1,212,907 | |

However, as noted, this computation runs afoul of the care of *Gilman* to assure that the liability of an individual defendant for noneconomic damages was limited to an amount commensurate with that defendant's personal share of fault.

Alternatively, plaintiffs posited a "common-sense approach" under which they added the economic damages of $1,366,357 and the MICRA noneconomic damages of $250,000 for a total of $1,616,357. They then subtracted *the entire $650,000 settlement with codefendants*, yielding a total of $966,357.

| | |
|---|---|
| $1,366,357 | Economic damages |
| + 250,000 | Noneconomic damages |
| - 650,000 | Offset of entire settlement with the other defendants |
| $966,357 | |

This proposal ignores the Proposition 51 requirement that defendants' liability for noneconomic damages not exceed their 20 percent share based on the jury's determination that they were only 20 percent at fault.

Plaintiffs' "common-sense approach" offends Proposition 51. Plaintiffs should bear the burden of undercontribution of the settling parties. (*DaFonte v. Up-Right, Inc., supra*, 2 Cal.4th at p. 604, fn. 6.) By comparison, the computation that the trial court employed here maximizes plaintiffs' recovery in that they recover all of the nonsettling defendants' 20 percent responsibility for noneconomic damages, but no more. In sum, plaintiffs have shown no error in the calculation of noneconomic damages. Consequently, plaintiffs may not recover their prejudgment interest based on their Code of Civil Procedure section 998 offer to compromise.

## DISPOSITION

The judgment is affirmed. Each party to bear its own costs on appeal and cross-appeal.

Croskey, Acting P. J., and Kitching, J., concurred.

On May 25, 2006, and on June 21, 2006, the opinion was modified to read as printed above.