Filed 11/18/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| ADRIA SNOVER, as represented, etc., <br>     Plaintiff and Appellant, <br> v. <br> ARUNA GUPTA, <br>     Defendant and Respondent. | A172568 <br><br> (Riverside County Super. Ct. No. RIC1905783) |

Adria Snover, through her spouse and guardian ad litem Jordan Callihan, appeals from a judgment awarding her $4,353,225 in damages against Dr. Aruna Gupta. She sued after medical complications during a cesarean section left her in a permanent coma. The jury awarded her close to $7.5 million in economic damages and $10 million in noneconomic damages. Before trial, she reached settlements with another doctor and with Riverside Community Hospital (the hospital). On appeal, she asserts three errors in the way the trial court reduced the damages award to account for the pretrial settlements and the jury's finding that Gupta's proportionate responsibility for Snover's injury was 15 percent, with other tortfeasors 85 percent at fault.

Snover's first claim of error arises from the interaction of two laws: Civil Code section 3333.2 (the Medical Injury Compensation Reform Act, or MICRA), which at the time capped noneconomic damages for professional negligence claims against health care providers at $250,000 (since raised to $350,000), and Civil Code section 1431.2 (often referred to as Proposition 51,

1

the 1986 initiative measure that enacted it), which provides that liability for noneconomic damages in every case is several only, with each defendant's liability allocated based on that defendant's percentage of fault.[1]  Because the tortfeasors here are all health care providers subject to MICRA, existing case law required the trial court first to apply the statutory cap to the jury's noneconomic damages award and then to hold Gupta liable for 15 percent of it, or $37,500.  (See *Gilman v. Beverly California Corp.* (1991) 231 Cal.App.3d 121, 128–129 (*Gilman*).)  Snover contends that the *Gilman* rule has been undermined by the Supreme Court's subsequent decision in *Rashidi v. Moser* (2014) 60 Cal.4th 718 (*Rashidi*), which held that the MICRA cap applies only to damages ordered by the court and does not include money the plaintiff recovers in settlements—although we hasten to point out that, at least in dictum, the *Rashidi* court endorsed the very approach that Snover would have us abandon.  Nonetheless, she argues that the order of operations should be reversed, meaning the trial court should have *first* multiplied the jury's $10 million noneconomic damages award by Gupta's 15 percent responsibility, resulting in $1.5 million, and *then* capped it at $250,000 pursuant to MICRA.

---

[1] Unless otherwise stated, statutory references that follow are to the Civil Code.  The MICRA cap was raised to $350,000 in January 2023. (Stats. 2022, ch. 17, § 3, eff. Jan. 1, 2023.)  We refer to the former version of the statute that was operative through December 31, 2022.  Subdivision (a) of section 1431.2 provides:  "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint.  Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount."

Snover's second, and (in her view) related, claim of error involves the addition of a third law to the mix. In contrast to noneconomic damages, liability for economic damages is joint. Civil Procedure Code section 877 allows a nonsettling defendant to set off the amount of any jointly liable tortfeasors' settlement against the damages awarded at trial.[2] The court must determine what portion of the settlement should be deemed to cover economic losses—the portion for which joint liability exists—since only that amount may be applied as a setoff (and only against the jury's award of economic damages). (*Rashidi, supra*, 60 Cal.4th at p. 722.) The widely accepted methodology is to calculate the percentage of the jury's total award that was allocated to economic damages, and then to apply the same percentage to the settlements. (*Espinoza v. Machonga* (1992) 9 Cal.App.4th 268, 275–277 (*Espinoza*).) Dividing the roughly $7.5 million economic damages award in this case by the total award of $17.5 million yields a figure of approximately 43 percent, which would mean that Gupta could set off 43 percent of Snover's settlement amounts against the jury's award of economic damages. But the case law requires an initial step when MICRA applies: The court first reduces the jury's noneconomic damages award to the MICRA cap, making the total award lower and, by extension, the percentage of it that consists of economic damages higher. (*Mayes v. Bryan* (2006)

---

[2] "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, or to one or more other co-obligors mutually subject to contribution rights, it shall have the following effect: [¶] (a) It shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it, whichever is the greater." (Code Civ. Proc., § 877.)

139 Cal.App.4th 1075, 1102–1103 (*Mayes*).) This adjustment allowed Gupta to apply almost 97 percent of the settlement amounts as a setoff against the jury's economic damages award. Again in reliance on *Rashidi*, Snover argues that the *Mayes* rule is incorrect, i.e., there is no valid reason to apply the MICRA cap to the jury's noneconomic damages award before calculating the "*Espinoza* percentage" applicable to the settlements.

In her final claim of error, Snover contends that, when the trial court valued the settlements for purposes of calculating the setoff, it should have excluded the amount of the hospital's settlement that the parties allocated to the compromise of her minor son's potential future wrongful death claim. Because the settlement had been approved by the probate court, she argues that it was impermissible for the trial court to treat her as the recipient of funds that her son obtained from the settlement.

Correcting for these three asserted errors, Snover contends that the trial court should have awarded her $6,426,844 in total damages, consisting of $6,176,844 in economic damages (rather than $4,315,724) and $250,000 in noneconomic damages (rather than $37,500). As explained below, we conclude that she has not established a basis to disturb the judgment.

## BACKGROUND

Snover sued Gupta, the hospital, and another doctor. The complaint alleged that these defendants, all subject to MICRA, negligently diagnosed and treated her, causing her to fall into a permanent coma. The hospital settled for $2.5 million, from which Snover claims her son received $250,000 in exchange for waiving his right to bring a future wrongful death action. A probate court order addressed the settlement between Snover and the hospital and authorized the disbursement of $250,000 from that settlement to her son. The other doctor, Neel Pandya, settled for $1 million. Excluding

4

$250,000 that went to Snover's husband in exchange for dismissing his loss of consortium claim and that the parties agree should not be counted, Snover thus received a total of either $3 million or $3.25 million from the two settlements, depending on whether one includes the $250,000 that the hospital settlement allocated to her son.[3]

Trial proceeded solely against Gupta. In a special verdict, the jury awarded Snover $17,458,474 in total damages: $7,458,474 in economic damages and $10 million in noneconomic damages. The jury allocated responsibility for Snover's injury as follows: 15 percent to Gupta, 80 percent to Pandya, and 5 percent to a nurse, Virginia Lozano.

After the verdict, the principal dispute concerned how the court should reduce Gupta's liability to account for Snover's prior settlements. Snover argued that the court should divide the jury's economic damages award of $7,458,474 by its total award of $17,458,474, yielding a ratio of .42721, or approximately 42.7 percent, and apply that percentage to a settlement value of $3 million. Instead, consistent with the *Mayes* rule, the court first reduced the noneconomic damage award from $10 million to $250,000 pursuant to MICRA, for a total damage award of $7,708,474 ($7,458,474 in economic damages plus $250,000 in noneconomic damages). The court then calculated the ratio of economic damages to total damages as 96.7 percent ($7,458,474 in

---

[3] The settlement agreement submitted to the probate court shows the amount of the husband's settlement with the hospital as $200,000 rather than $250,000, but the parties' papers in the trial court identified the value as $250,000, and the trial court excluded that amount from the settlement. We disregard the apparent discrepancy because on appeal the parties continue to agree that $250,000 should be excluded for the husband's settlement; the only note of disagreement is that Snover wrote in her opening brief that the $250,000 came from the settlement with Pandya, which Gupta then pointed out was not supported by information in the record.

economic damages ÷ $7,708,474 × 100).  Apparently rejecting Snover's argument that the $250,000 allocated to her son in the settlement with the hospital should be excluded, the court determined that Gupta was entitled to an offset of $3,142,750 from the settlements with the other defendants ($3.25 million × 96.7 percent).  This calculation resulted in a total adjusted award against Gupta of $4,315,724 in economic damages ($7,458,474 – $3,142,750).

With respect to noneconomic damages, again, the court followed the *Gilman* rule by applying the MICRA cap first, holding that Gupta was liable for 15 percent, or $37,500, of the capped award.  It rejected Snover's argument that Gupta was liable for $250,000 in noneconomic damages, representing application of the cap to 15 percent of the jury's $10 million award.

The court entered judgment against Gupta consistent with these calculations, in the amount of $4,353,225.

## DISCUSSION

## I.

Snover's first claim of error asks us to reject the *Gilman* rule as inconsistent with *Rashidi*.[4]  Because *Gilman* and *Mayes* (which followed and applied *Gilman*) both relied on the Supreme Court's account of the history

---

[4] Gupta initially argued that Snover forfeited her claims of error because she voluntarily submitted a proposed judgment that adopted the approach now challenged without maintaining her earlier objections to it.  At oral argument, however, Gupta's counsel volunteered that this argument was not well taken, and we accept the concession.  Snover was not required to continue to object after the trial court had selected between the parties' competing methodologies (see *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212–213; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403), and the record does not show that the court was ever misinformed about Snover's position.

leading to the passage of Proposition 51 when they concluded that the MICRA cap should be applied first, we start with a brief review of that history as well. (See *Gilman, supra*, 231 Cal.App.3d at pp. 127–128; *Mayes, supra*, 139 Cal.App.4th at pp. 1101–1102.)

**A.**

Prior to the adoption of comparative negligence principles in the mid-1970s, the contributory negligence rule meant that a jury's finding that a plaintiff "was at all negligent, no matter how slight," in bringing about the injury would preclude the plaintiff "from obtaining any recovery whatsoever." (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1196 (*Evangelatos*).) For defendants, by contrast, the joint and several liability rule meant that a finding of even minimal negligence rendered them liable for all the damages, "even if other concurrent tortfeasors had also been partially, or even primarily, responsible for the injury." (*Ibid.*) Moreover, "the governing rules at the time gave the plaintiff unilateral authority to decide which defendant or defendants were to be sued," and a defendant "generally had no right to bring other tortfeasors into the action, even if the other tortfeasors were equally or more responsible." (*Id.* at pp. 1196–1197.)

As *Evangelatos* further explained, two cases altered this common law structure. First, in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, the court adopted the comparative negligence doctrine to replace the contributory negligence rule, so that a contributorily negligent plaintiff was no longer barred recovery, " 'but the damages awarded shall be diminished in proportion to the amount of negligence attributable to the person recovering.' " (*Evangeletos, supra*, 44 Cal.3d at p. 1197.) Second, in *American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, the court retained joint and several liability, but allowed defendants to bring other tortfeasors into the

7

action through cross-complaints and to obtain equitable indemnity from other defendants on a comparative fault basis, "thus permitting a fair apportionment of damages among tortfeasors." (*Evangeletos*, at p. 1197.)

Notwithstanding these and other related developments, "the retention of the common law joint and several liability doctrine produced some situations in which defendants who bore only a small share of fault for an accident could be left with the obligation to pay all or a large share of the plaintiff's damages if other more culpable tortfeasors were insolvent." (*Evangeletos, supra*, 44 Cal.3d at p. 1198.) Proposition 51 was intended to address this issue. "While recognizing the potential inequity in a rule which would require an injured plaintiff who may have sustained considerable medical expenses and other damages as a result of an accident to bear the full brunt of the loss if one of a number of tortfeasors should prove insolvent, the drafters of the initiative at the same time concluded that it was unfair in such a situation to require a tortfeasor who might only be minimally culpable to bear all of the plaintiff's damages. As a result, the drafters crafted a compromise solution: Proposition 51 retains the traditional joint and several liability doctrine with respect to a plaintiff's *economic* damages, but adopts a rule of several liability for *noneconomic* damages, providing that each defendant is liable for only that portion of the plaintiff's noneconomic damages which is commensurate with that defendant's degree of fault for the injury." (*Ibid.*)

As the Supreme Court later explained, "The express purpose of Proposition 51 was to eliminate the perceived unfairness of imposing 'all the damage' on defendants who were 'found to share [only] a fraction of the fault.' (§ 1431.1, subd. (b).) In this context, the only reasonable construction of section 1431.2 is that a 'defendant['s]' liability for noneconomic damages

8

cannot exceed his or her proportionate share of fault *as compared with all fault responsible for the plaintiff's injuries,* not merely that of 'defendant[s]' present in the lawsuit." (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 603 (*DaFonte*).) But although the problem to which Proposition 51 responded arose principally when another tortfeasor was insolvent, its application is not limited to the situation "when insolvency prevents some tortfeasors from contributing their fair share of damages." (*Ibid.*) Rather, it " 'quite clearly is simply intended to limit the potential liability of an individual defendant for noneconomic damages to a proportion commensurate with that defendant's personal share of fault.' " (*Ibid.* [quoting *Evangelatos, supra*, 44 Cal.3d at p. 1204.) As *Gilman* put it, "a defendant is not liable for that portion of noneconomic damages attributable to a joint or concurrent tortfeasor, *even if the other tortfeasor is insolvent, or is not named as a defendant, or is immune, or, for some other reason is beyond the jurisdiction of the court.*" (*Gilman, supra*, 231 Cal.App.3d at pp. 127–128, italics added.)

## B.

In *Gilman*, the sole defendant was a nursing home. The jury found that the total noneconomic damages were $400,000, and that the decedent's treating physician (who was not named as a defendant) was 10 percent at fault. (*Gilman, supra*, 231 Cal.App.3d at p. 126.) Thus, the question was whether the nursing home was liable for $250,000 (taking 90 percent of $400,000, or $360,000, and then applying the MICRA cap to that amount), or only $225,000 (90 percent of the MICRA-capped award). (*Id.* at p. 128.) The plaintiff argued that two cases required the former approach: *McAdory v. Rogers* (1989) 215 Cal.App.3d 1273 (*McAdory*) and *Atkins v. Strayhorn* (1990) 223 Cal.App.3d 1380, 1393 (*Atkins*). The *Gilman* court found those cases distinguishable because neither one involved multiple tortfeasors subject to

9

MICRA; instead, the jury found that the plaintiffs' own negligence contributed to their injuries, and the defendants argued that the court should first cap the damages award pursuant to MICRA and then reduce it further by the plaintiffs' comparative fault under *Li v. Yellow Cab Co., supra*, 13 Cal.3d 804.  Reasoning from the premise that the jury's award, rather than the MICRA cap, is the true measure of the plaintiff's noneconomic loss, *McAdory* and *Atkins* held that the plaintiff's comparative fault should instead be applied to the jury's (uncapped) noneconomic damages award, with the MICRA cap then applied if the resulting amount still exceeded $250,000.  If the plaintiff's noneconomic loss as determined by the jury and reduced by the plaintiff's comparative fault did not exceed the MICRA cap, there was no need to reduce it further to ensure, as *Li* requires, that the plaintiffs did not recover for a portion of the injury caused by their own negligence.  (*McAdory*, at p. 1278; *Atkins, supra*, 223 Cal.App.3d at p. 1393.)

As the *Gilman* court wrote, "[n]either *McAdory* nor *Atkins* dealt with the interplay between Proposition 51 and the MICRA cap." (*Gilman, supra*, 231 Cal.App.3d at p. 126.)  Under Proposition 51, *Gilman* explained, the liability of any tortfeasor cannot depend on the presence or absence of other tortfeasors as defendants in the lawsuit or their ability to pay.  (*Id.* at p. 128.)  As the court illustrated with a series of hypotheticals, when the jury apportions liability among different tortfeasors, all of whom are subject to MICRA, the only way to adhere to Proposition 51 is by applying the cap first, such that the total liability of all of them together does not exceed it—i.e., regardless of whether some of them are absent or unable to pay.  Plaintiffs argued, for example, that if both the nursing home and the doctor had been named as defendants, but the doctor was insolvent, it would do no violence to either MICRA or Proposition 51 to collect the full $250,000 from the nursing

10

home—presumably on the theory that plaintiffs would obtain no more than the cap (in accordance with MICRA) and the nursing home would not be held liable for more than its 90 percent share of the noneconomic damages of $400,000 (in accordance with Proposition 51). (*Gilman, supra*, 231 Cal.App.3d at p. 128.) The court responded: "However, it would do violence to Proposition 51 to condition a defendant's liability for noneconomic damages upon whether other tortfeasors are solvent or not. It was precisely this inequity that Proposition 51 was intended to remedy. To apply plaintiffs' analysis would result in [the nursing home] owing an additional $40,000 simply because a concurrent tortfeasor, whose act of medical malpractice contributed to the plaintiffs' injury, was insolvent or not named in the lawsuit." (*Id.* at pp. 128–129.)

*Mayes* differed from *Gilman* in that it involved a settlement; all defendants were subject to MICRA and some of them settled for a total of $650,000 before trial. (*Mayes, supra*, 139 Cal.App.4th at p. 1098.)[5] The jury awarded $3 million in noneconomic damages and found that the settling doctors were 80 percent responsible and the remaining defendants 20 percent responsible. (*Id.* at p. 1087.) Following *Gilman*, the court concluded that the trial court properly held the nonsettling defendants liable for $50,000 in noneconomic damages, rather than $250,000 (based on application of the MICRA cap to 20 percent of $3 million, or $650,000). (*Id.* at p. 1102.) After quoting the Supreme Court's statement that a defendant's liability " ' cannot exceed his or her proportionate share of fault *as compared with all fault*

_____

[5] The suit was against "several physicians and nurses and their institutions who had been involved in Mrs. Mayes's treatment, including Dr. David C. Bryan, M.D. and Hill Medical Corporation." (*Mayes, supra*, 139 Cal.App.4th at p. 1079.) All but Dr. Bryan and Hill Medical Corporation settled before trial. (*Id.*, at p. 1098, fn. 13.)

*responsible for the plaintiff's injuries*, not merely that of 'defendant[s]' present in the lawsuit" ' " (*DaFonte, supra*, 2 Cal.4th at p. 603), the court agreed with *Gilman* that *McAdory* and *Atkins* were irrelevant because they did not involve Proposition 51. (*Mayes*, at p. 1102.) To hold the nonsettling defendants liable up to the full MICRA cap because other defendants had settled and were no longer before the court would run afoul of the rule under Proposition 51 that "[p]laintiffs should bear the burden of undercontribution of the settling parties." (*Mayes*, at p. 1103, citing *DaFonte,* at p. 604, fn. 6.)

In cases in which the other tortfeasors found to be partially responsible are *not* subject to MICRA, by contrast, courts have concluded that there is no reason to cap the award before applying the defendant's percentage of fault. In *Francies v. Kapla* (2005) 127 Cal.App.4th 1381 (*Francies*), the plaintiff sued his doctor for disclosing his medical condition to his employer and had previously recovered from the employer in a wrongful termination action and workers' compensation proceedings. The doctor was found to be two-thirds at fault, with the remaining third allocated to the employer. The court concluded that the doctor's two-thirds responsibility should be applied to the total noneconomic damages of $425,000 (resulting in liability of $283,000, then capped at $250,000), rather than to the MICRA-capped award. (*Id.* at pp. 1388–1389.) In that context, the court observed, *McAdory* and *Atkins* supplied the appropriate rule because the only difference was that the doctor's share of the fault "must be reduced to reflect the responsibility of a third party rather than of the plaintiff himself," and "MICRA provides no justification for reducing the damages for which he may be held liable below that amount because a third party *to whom MICRA does not apply* was also partially at fault." (*Id.* at p. 1388, italics added.) The court distinguished *Gilman* on the ground that, in that case, "the third party who shared

12

responsibility for the plaintiff's injury was also a health care provider, making it necessary, in effect, to apportion the $250,000 MICRA limit." (*Id.* at p. 1389.)

Similarly, in *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276 (*Bigler-Engler*), the court followed *Francies* where the jury returned a verdict against three defendants, only one of whom was subject to MICRA. (*Id.* at p. 328.) Although the other tortfeasors in *Bigler-Engler* were parties, rather than a non-party as in *Francies*, the court found the difference irrelevant because in both cases there was only one tortfeasor subject to the cap. (*Ibid.*) Like *Francies*, however, the court acknowledged that the cap must be applied first in cases where there are multiple tortfeasors subject to MICRA, citing *Gilman* and *Mayes*. (*Ibid.*)

### C.

*Rashidi* involved a plaintiff who sued his treating physician, a hospital, and a medical device manufacturer (which was not subject to MICRA), and settled with the latter two defendants. In the trial against the doctor, the jury made no findings about the percentage fault of the settling defendants, and awarded over $1.3 million in noneconomic damages, which the trial court reduced to $250,000. The question before the Supreme Court was whether the capped noneconomic damages award "may be further diminished by setting off the amount of a pretrial settlement attributable to noneconomic losses, even when the defendant who went to trial failed to establish the comparative fault of the settling defendant." (*Rashidi, supra*, 60 Cal.4th at p. 720.) The court said no, observing that "[i]t would be anomalous to allow a defendant to obtain a setoff against damages for which he is solely liable." (*Ibid.*)

13

The Court of Appeal had reasoned that MICRA limits a plaintiff's total recovery for noneconomic losses to $250,000 *whether in court or outside of it*, and therefore that if a plaintiff settles with another tortfeasor who is subject to MICRA, any portion of the settlement attributable to noneconomic losses must be deducted from the capped damages award notwithstanding the nonsettling defendant's failure to prove any degree of fault on the part of the settling defendant. (*Rashidi, supra*, 60 Cal.4th at p. 724.) The Court of Appeal thus "concluded that MICRA, as the more specific statute, must be read as an exception to section 1431.2's more general limitation on liability for noneconomic damages according to proportionate fault." (*Ibid.*)

The Supreme Court disagreed that the MICRA cap applies to recoveries obtained through settlement, drawing on the distinction between "losses" and "damages": Subdivision (a) of former section 3333.2 provided that "[i]n any action for injury against a health care provider based on professional negligence, the injured plaintiff shall be entitled to recover noneconomic losses to compensate for pain, suffering, inconvenience, physical impairment, disfigurement and other nonpecuniary damage," whereas subdivision (b) provided that "[i]n no action shall the amount of damages for noneconomic losses exceed two hundred fifty thousand dollars ($250,000)." Noting that the term "damages" is a "subset" of losses, and refers to " ' "money ordered by a court," ' " *Rashidi* concluded that MICRA places no limits on the "noneconomic losses" that may be recovered through a settlement. (*Rashidi, supra*, 60 Cal.4th at p. 725.) Since the Legislature did not intend "to include settlement recoveries in the cap on noneconomic damages," the statute did not require a court to offset against a capped noneconomic damages award any amounts recovered for noneconomic losses through settlements. (*Id.* at

14

p. 726.)  The conflict that the Court of Appeal perceived between the two statutes therefore did not exist.

As the Supreme Court again emphasized at the end of the opinion, however, the setoff was unwarranted because the doctor had failed to prove that anyone else bore any responsibility for the plaintiff's injury, meaning that, contrary to Proposition 51, the Court of Appeal had allowed him "a setoff against damages for which he alone was responsible." (*Rashidi, supra*, 60 Cal.4th at p. 727.)  The court added, however:  "Had [the doctor] established any degree of fault on his codefendants' part at trial, he would have been entitled to a proportionate reduction in the capped award of noneconomic damages." (*Ibid*.)  Therein lies the problem for Snover's argument.  Here, Gupta established that other tortfeasors were 85 percent at fault, so by holding her liable for 15 percent of the capped award, the trial court did exactly what *Rashidi* contemplates in that situation.

Snover points out that the court in *Bigler-Engler* found this statement was dictum "since it expressed views on a factual situation not before the Supreme Court (i.e., the result *if* the nonsettling defendant had proved fault on the part of the settling defendants) and was therefore not necessary for its decision." (*Bigler-Engler, supra*, 7 Cal.App.5th at p. 330.)  But *Bigler-Engler* found the dictum unpersuasive only when read to mean that a defendant is entitled to a proportionate reduction in the capped award even when the other defendants are *not* subject to MICRA.  It noted that the Supreme Court did not expressly consider the significance of the fact that one of the settling defendants in the case was not a health care provider subject to MICRA, and a "line of appellate authorities"—like *Francies*—had already concluded that there should be no reduction to a capped award of noneconomic damages based on the fault of a third party to whom MICRA does not apply. (*Ibid*.)

15

*Bigler-Engler* declined to assume that, by making a statement in dictum that was inconsistent with prior case law it did not mention, the Supreme Court intended to overrule that authority.

But the situation is different here. When all defendants are subject to MICRA, as in this case, the court's dictum was *consistent* with the rule in prior case law; indeed, the court cited *Gilman* in the opinion without any disapproval. (*Rashidi, supra*, 60 Cal.4th at p. 723.) As *Bigler-Engler* noted, "[a]s an intermediate appellate court, we do not lightly disregard dictum from our Supreme Court." (*Bigler-Engler, supra*, 7 Cal.App.5th at p. 330.) Thus, even though we may not be bound by the statement in *Rashidi*, we will not reach a result that is contrary to it without a persuasive showing that it is incorrect, and—as Snover claims—inconsistent with the court's actual holding. We now explain why we conclude that Snover has failed to make that showing.

## D.

Snover rests her argument on two premises, both of which are correct. The first is the same premise that drove the result in *McAdory* and *Adkins* (and by extension in *Francies* and *Bigler-Engler*): Although MICRA limits the amount of noneconomic damages that a plaintiff can *recover*, the jury's award of noneconomic damages is the actual measure of the plaintiff's noneconomic loss. (*McAdory, supra*, 215 Cal.App.3d at p. 1278; *Atkins, supra*, 223 Cal.App.3d at p. 1393.) As the Supreme Court itself has explained, "[t]he $250,000 cap . . . is not a legislative attempt to estimate the true damages suffered by plaintiffs, but rather an attempt to control and reduce medical malpractice insurance costs by placing a predictable, uniform limit on the defendant's liability for noneconomic damages." (*Salgado v. County of Los Angeles* (1998) 19 Cal.4th 629, 641.) The second premise comes

16

from *Rashidi*: The MICRA cap does not include any compensation for noneconomic losses the plaintiff recovers through settlement. (*Rashidi, supra*, 60 Cal.4th at p. 726.) Because the premises are correct, the question is whether they warrant the conclusion Snover draws from them. As she puts them together: Since (1) her actual noneconomic loss was $3 million and Gupta was responsible for 15 percent of that loss (based on the jury's findings), and (2) anything Snover recovered for noneconomic losses in her settlement with the hospital is not subject to the MICRA cap, it contravenes neither MICRA nor Proposition 51 to hold Gupta liable for $250,000 in noneconomic damages.

According to Snover, *Gilman* arrived at a different result based on a premise that *Rashidi* has since qualified: "Under MICRA, where more than one health care provider jointly contributes to a single injury, the maximum a plaintiff may recover for noneconomic damages is $250,000." (*Gilman, supra*, 231 Cal.App.3d at p. 128.) In her view, because *Rashidi* holds that this statement is true only for court-ordered damages and not for settlement recoveries, there is no reason to treat a settlement with a MICRA tortfeasor differently from a settlement with a non-MICRA tortfeasor; both of them lie outside MICRA's scope. And when the other tortfeasors are not subject to MICRA, the rule is that the nonsettling defendant's proportionate responsibility is applied to the jury's *uncapped* noneconomic damages award, with the cap then applied only if the resulting liability still exceeds it.

However, as quoted above, it was central to the courts' reasoning in both *Gilman* and *Mayes* that Proposition 51 does not permit a defendant's liability to vary depending on whether other tortfeasors found to be at fault are currently before the court. (*Gilman, supra*, 123 Cal.App.3d at p. 128; *Mayes, supra*, 139 Cal.App.4th at p. 1102.) While neither case considered an

17

argument that settlement recoveries are not subject to the MICRA cap, their understanding of Proposition 51 likely would have rendered the point irrelevant. To say that a defendant's liability cannot be higher because other tortfeasors are absent or unable to pay is to say that, for the purposes of determining liability, the court must treat the defendant *as if* all other identified tortfeasors are present and solvent. Here, if the hospital and both doctors had gone to trial, the noneconomic damages would have been capped at $250,000 pursuant to MICRA and would have been divided among them based on the jury's allocation of fault, with Gupta liable only for $37,500. It was thus incumbent on Snover to explain either why this understanding of Proposition 51 is incorrect, or why the imposition of greater liability on Gupta is permissible under it simply because other tortfeasors the jury identified as partially responsible for Snover's injury were no longer "present in the lawsuit." (*DaFonte, supra*, 2 Cal.4th at p. 603.)

Snover fails to address this issue because she locates the problem elsewhere: She contends that *Gilman* "presupposes that Section 3333.2 is a legislative determination of damages." But this contention is unexplained, and we see no such presupposition in the opinion. While *Gilman* distinguished *McAdory* on the ground that the case did not involve Proposition 51, it nowhere disagreed with *McAdory*'s statement that the jury's award of noneconomic damages, rather than the MICRA cap, is the actual measure of the plaintiff's loss. Rather, as we have explained, the *Gilman* rule was based on the court's understanding that, under Proposition 51, a tortfeasor's liability for noneconomic damages does not change depending on whether other tortfeasors responsible for the injury are present in the lawsuit.

18

Without more, then, there is no inconsistency between *Rashidi*'s holding that the MICRA cap does not apply to settlement recoveries and its dictum that, under Proposition 51, when the jury has allocated responsibility among multiple tortfeasors, the percentage fault of a nonsettling defendant must be applied to the capped award (at least if the other tortfeasors are health care providers subject to MICRA). Nor does there appear to be any inconsistency between *Rashidi*'s endorsement of the *Gilman* rule and *Salgado*'s holding that the jury's award, rather than the MICRA cap, is the measure of the plaintiff's noneconomic loss. Accordingly, Snover has not persuaded us that we should depart from the *Gilman* rule and disregard the Supreme Court's dictum in *Rashidi*.

## II.

We turn now to the *Mayes* rule, which the trial court applied to determine the amount of the pretrial settlements to be applied as setoff against the jury's award of economic damages. (Code Civ. Proc., § 877.) To recap, under Proposition 51 it is necessary to allocate settlements between economic and noneconomic damages because joint liability exists only for economic damages, so " 'only the amount attributable to the joint responsibility for economic damages may be used as an offset.' " (*Rashidi, supra*, 60 Cal.4th at p. 722.) Or as *Espinoza* explained, because "each defendant is solely responsible for his or her share of the noneconomic damages," to use any portion of the settlement attributable to noneconomic damages as a setoff "would, in effect, cause money paid in settlement to be treated as if it was paid as a joint liability." (*Espinoza, supra*, 9 Cal.App.4th at pp. 276–277.)

Under *Espinoza*'s methodology, the court calculates the percentage of the jury's total award that was allocated to economic damages, and then

19

applies the same percentage to the settlements to determine the setoff. (*Espinoza, supra*, 9 Cal.App.4th at pp. 276–277.)  The problem to which *Espinoza* responds is that settling parties rarely allocate the proceeds between economic and noneconomic losses, and even if they did so, their allocation would be "inherently suspect" as a basis for determining a setoff. (*Greathouse v. Amcord, Inc.* (1995) 35 Cal.App.4th 831, 841.)  That is because "[t]he negotiated allocation between economic and non-economic damages will inevitably reflect a bias against economic damages that is prejudicial to a nonsettling defendant.  The plaintiff has an interest in allocating as little as possible of the settlement to economic damages; the smaller the allocation to economic damages, the less the nonsettling defendants can claim as a credit against a verdict or judgment in the plaintiff's favor.  [Citation.]  The settling defendants have no incentive to oppose the plaintiff's allocation because they are entirely unaffected by it." (*Ibid.*)  The *Espinoza* methodology "eliminates this kind of bargaining at the non-settling defendant's expense." (*Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 38 (*Torres*).)

Courts have recognized, however, that there are some circumstances in which a departure from *Espinoza* is warranted.  For example, if the plaintiff dies after the settlement but before trial, the jury's verdict may not supply an appropriate allocation because damages for pain and suffering were available at the time of settlement but not at the time of trial.  (*Ehret v. Congoleum Corp.* (1999) 73 Cal.App.4th 1308, 1319, 1322.)  Or if a defendant settles *after* the jury has rendered its verdict, so that both sides already know the defendant's actual liability, the portion of the settlement allocated to noneconomic damages should not exceed the defendant's liability established by the jury's verdict.  (*Torres, supra*, 49 Cal.App.4th at pp. 39–42.)  Otherwise, the excess allocation to noneconomic damages would operate as a

20

"windfall" to the plaintiff, allowing the plaintiff to recover more from the settlement and judgment together than the plaintiff would recover by collecting the full amount of the judgment against the defendants in the absence of a settlement. (*Id.* at p. 40.) "The prospect of such a windfall could become a factor in settlement negotiations, with the plaintiff agreeing to accept a lesser amount than it otherwise would because the shortfall could be collected from the nonsettling defendant. Thus, one of the concerns which led to adoption of the *Espinoza* approach for pre-verdict settlements—bargaining at the expense of the non-settling defendants [citation]—suggests that a different approach should be used for postverdict settlements." (*Ibid.*)

The *Mayes* rule is another instance of a departure from the standard application of the *Espinoza* formula; again, when both the settling and nonsettling defendants are subject to MICRA, it requires the court to first reduce the jury's total award by applying the statutory cap to the non-economic damages portion. (*Mayes, supra*, 139 Cal.App.4th at pp. 1102–1103.) According to Snover, this approach rests on the same error she finds in the *Gilman* rule; namely, it incorrectly assumes that the MICRA cap is the actual measure of plaintiff's noneconomic loss rather than a limitation on the amount of any recovery at trial. But just as we were unpersuaded in our discussion above that the *Gilman* rule requires such an assumption, we are unpersuaded that the *Mayes* rule does either.

As we see it, the rule reflects the fact that, before deciding whether to settle, all parties know that at trial no defendant's liability for noneconomic damages can exceed the MICRA cap. *Rashidi* explained that the MICRA cap indirectly "restrains the size of settlements" because the settlement negotiations "are based on liability estimates that are necessarily affected by the cap." (*Rashidi, supra*, 60 Cal.4th at p. 727.) Using the *Espinoza*

21

methodology without applying the MICRA cap would ignore this reality by permitting the allocation of settlement dollars to noneconomic losses in an amount far in excess of any defendant's possible liability for them.[6]  Here, the *Espinoza* methodology would treat 57.3% of the $3.25 million Snover received from her settlements, or over $1.86 million, as noneconomic damages, which is more than seven times the amount of the defendants' maximum liability under MICRA individually or collectively.  When MICRA does not apply, the *Espinoza* methodology results in an allocation between economic and noneconomic losses that the settling parties themselves might reasonably have made given the uncertainty that existed at the time and in the absence of an ulterior motive to reduce any later setoff.  (See *Torres, supra*, 49 Cal.App.4th at p. 39 [in a preverdict settlement, "the parties are dealing with unknowns and the settlement is based on potential, rather than actual, liability"].)  But the same cannot be said when MICRA applies.  Although the settling defendant's proportionate responsibility for noneconomic damages is unknown, its maximum possible liability is established by the MICRA cap.

---

[6] This is how we understand the *Mayes* court's statement that a failure to apply the MICRA cap before calculating the *Espinoza* percentage would "run[] afoul of the care of *Gilman* to assure that the liability of an individual defendant for noneconomic damages was limited to an amount commensurate with that defendant's personal share of fault." (*Mayes, supra*, 139 Cal.App.4th at p. 1103.)  We read this sentence to refer to the nonsettling defendants' proportionate share of the MICRA capped recovery against them, but we note that the setoff under the *Mayes* rule is not tied to the proportionate responsibility of each tortfeasor for noneconomic losses.  The amount of the setoff under the rule is the same regardless of whether or how the jury allocated fault among the settling and nonsettling defendants.  That is equally true of the standard *Espinoza* methodology, consistent with the rule that the defendants are jointly liable for economic damages regardless of their share of fault.  (See *Hellam v. Crane Co.* (2015) 239 Cal.App.4th 851, 866; *Poire v. C.L. Peck/Jones Brothers Construction Corp.* (1995) 39 Cal.App.4th 1832, 1838–1840.)

(Cf. *ibid.* [in a postverdict settlement, where the settling parties already know the defendant's liability for noneconomic damages, no more of the settlement corresponding to that liability "could fairly be viewed as a payment on account of that liability"].)

The problem of unrealistic allocations of settlement dollars to noneconomic damages, driven by the plaintiff's motive to reduce the amount of any setoff, is precisely what the *Espinoza* methodology was intended to avoid. To be sure, its use when MICRA applies would not be equivalent to allowing the settling parties to invent an allocation at the nonsettling defendant's expense. But because MICRA caps all defendants' liability for noneconomic damages, the *Espinoza* methodology will foreseeably over-allocate settlement proceeds to noneconomic losses, and thus artificially reduce the amount of any setoff, whenever the jury awards noneconomic damages in excess of the cap. This result is in tension with the purpose of Code of Civil Procedure section 877 to prevent double recoveries (*Schreiber v. Lee* (2020) 47 Cal.App.5th 745, 760) and, as discussed in *Torres, supra*, 49 Cal.App.4th at page 40, potentially skews the plaintiff's settlement incentives. Contrary to Snover's argument, however, nothing in this rationale for the *Mayes* rule requires an assumption that the MICRA cap furnishes the actual measure of the plaintiff's noneconomic loss; it merely recognizes that parties deciding whether to settle, and for how much, will take into account that the defendant's liability for noneconomic damages will be capped by the statute if they go to trial. (*Rashidi, supra*, 60 Cal.4th at p. 727.)

The *Mayes* rule does not apply when the prior recoveries were not obtained from health care providers covered by MICRA. In *Francies*, the court pointed out that "the MICRA cap had no effect on the amounts

23

recovered either from Francies's employer or as workers' compensation benefits," so "the relevant ratio is the actual economic damages as a percentage of the total damages suffered by Francies, not the ratio between the economic damages and the amount of damages that Francies can recover from [the doctor]." (*Francies, supra*, 127 Cal.App.4th at p. 1387.) And although the setoff for *economic* damages was not before the Supreme Court in *Rashidi*, it noted that the Court of Appeal had adopted two different approaches for that calculation. For the settlement with the medical device manufacturer (which was not a health care provider subject to MICRA), the court calculated the economic damages award as a percentage of the jury's total award, whereas for the settlement with the hospital, it took the economic damages award as a percentage of the total award *after* reducing the noneconomic portion to the MICRA cap. (*Rashidi, supra*, 60 Cal.4th at pp. 722–723.) Nothing in the Supreme Court's opinion calls into question the Court of Appeal's approach to the economic damages setoff in either respect.[7]

Snover cites *Collins v. County of San Diego* (2021) 60 Cal.App.5th 1035 (*Collins*), in which the jury found in favor of the plaintiff on a negligence claim against two deputies involved in his arrest and two nurses employed by the county who attended to him while in jail. Before trial, the plaintiff settled for $2.75 million with a hospital and four of its doctors on his cause of action for professional negligence. (*Id.* at pp. 1045–1046.) The jury awarded noneconomic damages of $8 million and economic damages of approximately

---

[7] Under the logic of *Francies* and the Court of Appeal's approach in *Rashidi*, the decisive consideration appears to be whether the *settling* defendants were subject to MICRA rather than whether the nonsettling defendants were. We have no occasion to address that issue here because, as in *Mayes* itself, in this case both the settling and nonsettling defendants are subject to MICRA.

$4.6 million; it found that the two deputies together were 30 percent at fault and the two nurses 70 percent, and was not asked to allocate the fault of the settling parties. (*Id.* at p. 1046 & fn. 5.) Without objection, the trial court reduced the nurses' liability for noneconomic damages to $250,000 (applying the MICRA cap to 70 percent of $8 million). For the setoff calculation, however, the trial court declined to apply the MICRA cap when determining the percentage of the total award allocated to economic damages. (*Id.* at pp. 1063–1064.) The appellate court found no error in this approach. It distinguished *Mayes* on the ground that all the defendants there, "both settling and nonsettling, were subject to the MICRA limit," and that, "distinct from this case, the jury was also tasked with determining the settling defendants' proportionate liability." (*Id.* at p. 1065.) It further reasoned that the trial court's approach was supported by *Rashidi*'s holding that the MICRA cap does not apply to settlement recoveries. (*Id.* at pp. 1066–1067.) It explained: "Unlike the calculation advanced by the *Mayes* appellant, the calculation by the trial court here did not run afoul of either MICRA or Proposition 51. The County defendants were not held liable for any portion of noneconomic *damages* attributed to another defendant by the finder of fact, and received the benefit of MICRA." (*Id.* at p. 1067.)

While some language in *Collins* may lend support to Snover's position, in our view it does so only insofar as it is in tension with the other cases we have discussed. While two of the nonsettling defendants—the deputies— were not subject to MICRA, the nurses were, and the settling parties were likewise health care providers covered by the statute. The court distinguished *Mayes* in part on the ground that the *Collins* jury made no finding of the percentage fault of the settling parties (*Collins, supra,* 60 Cal.App.5th at p. 1065), but the proportionate responsibility of the settling

25

parties in *Mayes* played no role in the *Espinoza* calculation:  The court reduced the total damages award to the MICRA cap, not to the portion of it ($50,000) for which the nonsettling defendants were held liable.  The settling and nonsettling defendants, all of whom were subject to MICRA, collectively could not have been held liable for more than the MICRA capped recovery against them, regardless of how or whether the jury allocated responsibility among them.  The court acknowledged that it "seems sensible that all of the defendants that are subject to MICRA (including those that have already settled) should be responsible for the same or similar percentage of economic and noneconomic damages," but ultimately rejected such an approach on the grounds that a "settlement and a damage award are not the same" and "[w]hat the trier of fact would have awarded Collins for the settling defendants' conduct, and what portion of fault it would have allocated to them is entirely speculative." (*Collins, supra*, 60 Cal.App.5th at p. 1067.)

Taking these points in turn:  First, it is true that settlement recoveries can be affected by additional factors such as the defendant's desire to avoid the expense of litigation and potential negative publicity (*Collins, supra*, 60 Cal.App.5th at p. 1067), but while these considerations could lead a settling party to pay somewhat more than its estimate of its likely total liability at trial, they would not cause it to assume that its potential liability for noneconomic damages could exceed the MICRA cap.  (See *Rashidi, supra*, 60 Cal.4th at p. 727.)  Second, the premise of joint liability, and of the setoff under Code of Civil Procedure section 877, is that, regardless of whether all tortfeasors are present, the plaintiff has suffered " 'one indivisible injury' " for which the "jury verdict determined 'the total amount of damages.' " (*Greathouse v. Amcord, Inc., supra*, 35 Cal.App.4th at p. 840.)  Thus, we see no legal reason to speculate about whether the jury would have awarded

26

additional damages based on the conduct of the settling defendants. Third, as noted above, the jury's allocation of proportionate responsibility to the settling parties did not affect the *Espinoza* calculation in *Mayes*, and more generally has no impact on the amount of any setoff against the award of economic damages. As in *Mayes*, if the settling parties in *Collins* had instead gone to trial, the noneconomic damages for all of them and the nurses together would have been capped at $250,000.

Lastly, we note that the only alternatives presented in the trial court and on appeal were the *Mayes* rule and the *Espinoza* methodology (i.e., unadjusted by application of the MICRA cap to the jury's award), so we have no occasion to consider whether there are other possible approaches to the problem. For the reasons we have discussed, Snover has not persuaded us that the unadjusted *Espinoza* methodology is preferable to the *Mayes* rule when all tortfeasors are health care providers subject to MICRA.

## III.

Finally, we take up Snover's argument that, when valuing her settlement with the hospital, the trial court should have excluded the $250,000 allocated to settle her son's potential future wrongful death claim because the settlement had been approved by the probate court. Gupta responds that the probate court's order does not constitute approval of any settlement with Snover's son and that the trial court was not required to exclude the $250,000 if Snover failed to carry her burden to show that the amount was reasonable and the product of adequately adversarial negotiations. (See *Jones v. John Crane, Inc.* (2005) 132 Cal.App.4th 990, 1009–1011 (*Jones*).) We find no abuse of discretion.

The caption of the probate court order has the box checked for "person with a disability," rather than the box for "minor," and the box checked for

"compromise of pending action," making it, in full, an order approving the compromise of a pending action for a person with a disability. The box for "disputed claim," which would be used for a potential action such as a wrongful death claim that had not yet accrued, was not checked. Additional boxes on the front page refer to Snover as the claimant, with the boxes "adult" and a "person with a disability" checked. Snover's son is a minor, not an adult, and it does not appear from the record that he is a person with a disability.

The order goes on to list disbursements from the total $2.5 million settlement for various expenses and recipients, including for attorneys' fees, medical fee reimbursements, and the payment of a medical lien. Within the list of disbursements, the order refers to the $250,000 disbursement to Snover's son in two places. The first reference is under a heading titled: "Other authorized disbursements payable directly to third parties." It states: "$250,000 is to be allocated to [the son] . . . for his waiver of potential wrongful death claim to be paid by way of an annuity purchased by [the hospital]." The second reference is in an attachment describing the "amount and terms of settlement," which states that the total settlement amount is $2,500,000, lists various disbursements from that amount, and describes details of the purchase of an annuity for the son using the $250,000. The order states that the undistributed remainder of $745,000 is to be used to purchase an annuity and to establish a trust, both for Snover's benefit.

In sum, the order appears only to have granted Snover's petition for approval of her settlement with the hospital, not to have approved an agreement between the hospital and her son. Her son was not a party to the action and no settlement agreement with him was submitted to the probate court. Snover has not identified any authority establishing that the probate

28

court, in order to approve the hospital's settlement with *her*, was required to find that the amount allocated to her son was a reasonable compromise of *his* interest in a potential future wrongful death claim or to make any other particular finding about the purported settlement with her son. Albeit without citing authority, Snover does assert that, because her son is a minor, "[a]ny compromise of his right to file an action must be approved by the court." While we accept that the settlement of a minor's action or claim requires court approval (Code Civ. Proc., § 372, subd. (a)(3); Prob. Code, § 3500, subd. (b)), Snover offers no argument or authority that any approval required here either was or properly could have been obtained by the filing of a petition that, on its face, sought the probate court's approval only of a settlement with her (as a person with a disability) for a pending action to which her son was not a party. Snover also does not show that she otherwise sought or obtained a good-faith determination of the settlement with the hospital. (Code Civ. Proc., § 877.6.) In the absence of such circumstances, "the trial court was not bound by the allocations made" in the agreement. (*Jones, supra*, 132 Cal.App.4th at p. 1009.)

" '[W]here an allocation is made of settlement proceeds which will affect the ultimate setoff or credit that a nonsettling defendant will receive against any future judgment, the allocation may not be given presumptive effect unless it was the product of adverse negotiation.' [Citation.] Ordinarily 'settling defendants . . . are not in an adversarial position with plaintiffs as to the allocation of settlement proceeds to separate causes of action. While plaintiffs have an interest in allocating as large an amount as possible to causes of action[] in which there are no nonsettling defendants, the settling defendants will be released of further claims against them regardless of the allocation and thus have no [other relevant] interest in the allocation of the

29

settlement proceeds . . . .' [Citation.] Accordingly, '[w]here the settling parties have agreed to allocate less than all of the settlement amount to a portion of the causes of action, an evidentiary showing is required to justify such allocation.' " (*Jones*, *supra*, 132 Cal.App.4th at pp. 1009–1010.) A party, like Snover, who "seek[s] to rely on the allocation 'must explain to the court and to all other parties, by declaration or other written form, the evidentiary basis for any allocations and valuations made, and must demonstrate that the allocation was reached in a sufficiently adversarial manner to justify the presumption that a reasonable valuation was reached.' " (*Id.* at p. 1010.)

The trial court has "wide discretion in allocating prior settlement recoveries to claims not adjudicated at trial." (*Jones*, *supra*, 132 Cal.App.4th at 1008.) Snover does not point to any evidentiary showing in the record to satisfy her duty under *Jones* to prove that the amount disbursed to her son was reasonable and arrived at in a sufficiently adversarial proceeding that it should be deducted from the hospital's settlement with her. This is therefore not a case where the plaintiff presented "a significant amount of evidence" supporting the allocation of settlement funds to claims specified in pretrial settlement agreements. (*Hellam v. Crane Co., supra*, 239 Cal.App.4th at pp. 860–862 [affirming the trial court's subtraction of settlement amounts from the total offsets granted the nonsettling defendant].) Instead, it is more like *Jones*, where the court of appeal affirmed the trial court's refusal "to allocate any portion of the prior settlements to a potential wrongful death action" because the plaintiffs had presented no evidence to meet their burden to show that the allocations set forth in the settlement agreements were reasonable and "based on an individualized consideration of the potential claims of [the decedent's] heirs." (*Jones*, at pp. 1010–1011.) In short, absent a showing of reasonableness or a finding of good faith, Gupta was "entitled to

30

a setoff of the entire settlement figure." (*Knox v. County of Los Angeles* (1980) 109 Cal.App.3d 825, 836.)  Snover has not shown that the trial court abused its discretion in declining to deduct the $250,000 distributed to her son for purposes of the offset calculation.

## DISPOSITION

The judgment is affirmed.  Gupta is entitled to recover her costs on appeal.

GOLDMAN, J.

WE CONCUR:

BROWN, P. J.
STREETER, J.

| | |
|---|---|
| Trial Court: | Riverside County Superior Court |
| Trial Judge: | Honorable Irma Asberry |
| Counsel for Plaintiff and Appellant: | The Stevens Firm, Steven B. Stevens Law Offices of Bruce G. Fagel & Associates, Bruce G. Fagel |
| Counsel for Defendant and Respondent: | Wood, Smith, Henning & Berman, Steven R. Disharoon |